UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

DONALD P. BOLAND and MARY A.
BOLAND, Individually and on Behalf of All
Others Similarly Situated,

                              Plaintiffs,

          vs.

GERDAU S.A., JORGE GERDAU
JOHANNPETER, ANDRÉ BIER GERDAU
JOHANNPETER, CLAUDIO GERDAU
JOHANNPETER, OSVALDO BURGOS
SCHIRMER, EXPEDITO LUZ, ANDRÉ
PIRES DE OLIVEIRA DIAS, HARLEY
LORENTZ SCARDOELLI and RENATO
GASPARETTO JR.,

                              Defendants.

———————————————————— x

: Civil Action No. 1:16-cv-03925-LLS
:
: CLASS ACTION
:
: LEAD PLAINTIFF'S CONSOLIDATED
: COMPLAINT FOR VIOLATIONS OF THE
: FEDERAL SECURITIES LAWS
:
:
:
:
:
:
:
:
:
:
:
:
: DEMAND FOR JURY TRIAL

1197925_1

**TABLE OF CONTENTS**

**Page**

I.      NATURE OF THE ACTION ........................................................................................1

II.     DEFENDANTS' FRAUDULENT SCHEME ...........................................................2

    A.      The 2004-2005 Transactions.........................................................................2

    B.      Brazil's Tax Litigation Process and the Launching of Operation Zelotes..............6

    C.      Gerdau's Tax Appeals and Implication in Operation Zelotes ................................7

    D.      Disclosures Regarding Gerdau's Possible Tax Fraud, but Defendants
            Vigorously Deny Wrongdoing................................................................................11

III.    JURISDICTION AND VENUE ...............................................................................17

IV.     PARTIES .................................................................................................................17

V.      DEFENDANTS' FRAUDULENT SCHEME AND MATERIALLY FALSE AND
       MISLEADING STATEMENTS DURING THE CLASS PERIOD .................................19

    A.      False Statements in 2012 ......................................................................................19

          1.      2011 Form 20-F ........................................................................................19

          2.      1Q12 Quarterly Results.............................................................................26

          3.      2011 Annual Report ..................................................................................27

          4.      1Q12 Quarterly Report .............................................................................28

          5.      2Q12 Quarterly Results.............................................................................29

          6.      3Q12 Quarterly Results.............................................................................30

    B.      False Statements in 2013 ......................................................................................32

          1.      4Q12 Quarterly Results.............................................................................32

          2.      2012 Management Report..........................................................................33

          3.      2012 Form 20-F ........................................................................................34

          4.      1Q13 Quarterly Results.............................................................................36

          5.      2012 Annual Report ..................................................................................37

**Page**

| | | | |
|---|---|---|---|
| | 6. | 2Q13 Quarterly Results | 38 |
| | 7. | 3Q13 Quarterly Results | 39 |
| C. | | False Statements in 2014 | 42 |
| | 1. | 4Q13 Quarterly Results | 42 |
| | 2. | 2013 Management Report | 42 |
| | 3. | 2013 Form 20-F | 43 |
| | 4. | 1Q14 Quarterly Results | 45 |
| | 5. | 2013 Annual Report | 46 |
| | 6. | 2Q14 Quarterly Results | 47 |
| | 7. | 3Q14 Quarterly Results | 48 |
| D. | | False Statements in 2015 | 51 |
| | 1. | 4Q14 Quarterly Results | 51 |
| | 2. | March 26, 2015 – Gerdau's Name Comes Up in Zelotes Investigation, but Defendants Deny Involvement | 51 |
| | 3. | 2014 Form 20-F | 52 |
| | 4. | 1Q15 Quarterly Results | 54 |
| | 5. | 2014 Annual Report | 55 |
| | 6. | July 14, 2015 – Gerdau Discloses Questionable Plan to Purchase Minority Interest in Controlled Companies; CFO Resigns Next Day | 56 |
| | 7. | 2Q15 Quarterly Results | 56 |
| | 8. | 3Q15 Quarterly Results | 58 |
| VI. | | THE TRUTH BEGINS TO EMERGE, BUT DEFENDANTS DENY WRONGDOING | 61 |

1197925_1

**Page**

A.   December 4, 2015 – Gerdau Named as a Beneficiary of Tax Evasion Scheme ...................................................................................61

B.   Gerdau's Continued False Statements ................................................61

1.   February 25, 2016 – First "Notice to the Market" ....................61

2.   February 25, 2016 – Second "Notice to the Market"................62

3.   February 29, 2016 – Gerdau Delays Earnings Announcement.................63

4.   4Q15 Quarterly Results and Management Report .....................64

5.   2015 Form 20-F ........................................................................66

6.   April 18, 2016 – Amidst Rumors of Zelotes Involvement, Gerdau Discloses Stunning Details of Questionable Dealings with Bank Itaú ...............................................................71

7.   1Q16 Quarterly Results.............................................................72

VII.   GERDAU'S CEO INDICTED – ADR PRICE TUMBLES ..............................76

VIII.   POST CLASS-PERIOD EVENTS AND REVELATIONS ...............................79

IX.   GERDAU'S CLASS-PERIOD FINANCIAL REPORTS DID NOT COMPLY WITH INTERNATIONAL FINANCIAL REPORTING STANDARDS.......................80

A.   Misleading Representations About Gerdau's Income Tax Policies and Procedures..........................................................................82

B.   Material Misrepresentations About Gerdau's Income Tax Liabilities, Expense and Net Income ...................................................83

C.   Misleading Representations About Gerdau's Contingencies ..............86

X.   ADDITIONAL SCIENTER ALLEGATIONS .................................................89

A.   Defendants Were Aware of All Details of the Corporate Restructuring Transactions Implemented in 2005 to Support the Goodwill Deductions...........89

B.   The Individual Defendants Were Specifically Tasked with Monitoring Gerdau's Compliance and Reputational Risks ....................................91

- iii -

**Page**

C.     The Individual Defendants Were Members of Gerdau's Disclosure
       Committee ..................................................................................................92

D.     Defendants Violated Gerdau's Code of Ethics .........................................93

XI.     LOSS CAUSATION ...........................................................................................94

XII.    APPLICABILITY OF A PRESUMPTION OF RELIANCE ...........................95

XIII.   NO SAFE HARBOR ..........................................................................................96

XIV.    CLASS ACTION ALLEGATIONS ...................................................................96

COUNT I ........................................................................................................................98

COUNT II .....................................................................................................................100

COUNT III ....................................................................................................................101

PRAYER FOR RELIEF ...............................................................................................102

JURY DEMAND ..........................................................................................................103

1197925_1

Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago ("Chicago Police" or "Lead Plaintiff") alleges the following based upon the investigation of Lead Plaintiff's counsel, which included a review of documents created and/or published by Gerdau S.A. ("Gerdau" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories about the Company, releases and other public statements issued by the Company, media reports about the Company, and publicly available police reports and judicial decrees concerning the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      Lead Plaintiff seeks to pursue claims under the Securities Exchange Act of 1934 (the "Exchange Act") arising out of its purchases of Gerdau American Depositary Receipts ("ADRs") between April 23, 2012 and May 16, 2016 (the "Class Period"). Chicago Police purchased Gerdau ADRs during the Class Period and was damaged thereby.

2.      Gerdau is one of the world's largest steel producers. It has operations in South America, North America, Central America and India. The Company is based in Porto Alegre, Brazil, and is a subsidiary of Metalúrgica Gerdau S.A. Gerdau ADRs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "GGB."

3.      Prior to and during the Class Period, Gerdau was engaged in a bribery scheme in collusion with members of Brazil's Administrative Council of Tax Appeals (Conselho Administrativo de Recursos Fiscais, or "CARF"). The scheme reached the highest levels of the Company, including Gerdau's Chief Executive Officer ("CEO"), defendant André Bier Gerdau Johannpeter, who was ultimately indicted for his participation in the scheme. Gerdau and its officers and directors improperly influenced CARF to waive or reduce the Company's corporate tax

1197925_1

liabilities.  At the end of the Class Period, it was revealed to the market that Gerdau had defrauded Brazilian tax authorities of roughly R$1.42 billion (approximately US$429 million).[1]  Together with penalties and interest, Gerdau owes nearly R$4 billion to the Brazilian government.

## II.   DEFENDANTS' FRAUDULENT SCHEME

4.      The underlying facts of this case date back to 2005 when the Gerdau family, many of whom held high-level executive management positions in the Company and seats on Gerdau's Board of Directors, engaged in highly questionable corporate transactions in an attempt to reduce the Company's tax liability.  Gerdau convinced Itaú BBA, a large Brazilian bank, to lend the Company R$500 million to accomplish these transactions.  Gerdau disguised the loan by making it appear as equity investments by Itaú BBA in certain subsidiaries of Gerdau.  Unknown to investors and even other minority shareholders in the Gerdau subsidiaries was the fact that, in order to secure the equity investments, Indac – Indústria ("Indac") – the parent company to Gerdau, which was controlled by the Gerdau family – granted Itaú BBA a put option requiring Indac to repurchase the equity in 2015.  Gerdau attempted to use the Itaú BBA loan, disguised as an equity investment, to legitimize enormous goodwill tax deductions Gerdau took from the corporate transactions.

### A.      The 2004-2005 Transactions

5.      Until the end of 2004, Gerdau held the following interests in three of its subsidiaries: Gerdau Internacional (94.88% owned), Gerdau Participações (98.98% owned) and Gerdau Açominas (91.49% owned).

---

[1]      Amounts preceded by "R$" are stated in Brazilian reais.  The exchange rate as of the date of filing is approximately US$0.31 to R$1.00.

Day 0, before the corporate reorganization:



Fig.1

6.      On December 29, 2004, Gerdau increased the corporate capital of Gerdau Participações by merging its holdings of Gerdau Açominas and 22.8% of Gerdau Internacional into Gerdau Participações.  This transaction served to load Gerdau Participações up with enormous amounts of goodwill from the other subsidiaries.

December 29th, 2004:
Increase of the corporate capital of Gerdau Participações by means of the merger of shares of Gerdau Açominas and Gerdau International.  This arrangement resulted in goodwill transferring to Gerdau Participações:



Fig.2

- 3 -

7.      On April 28, 2005, Gerdau entered into the agreement with Itaú BBA whereby the bank agreed to lend Gerdau money disguised as an equity investment in the Company's subsidiaries. Itaú BBA agreed to invest in Gerdau Participações with the condition that the subsidiary would be subsequently merged into Gerdau Açominas.  On May 6, 2005, Itaú BBA completed its investment, and on May 9, 2005, Gerdau Participações was merged into Gerdau Açominas.  By means of that transaction, Gerdau Açominas also acquired the goodwill Gerdau Participações possessed via the increase of its corporate capital through the merger of Gerdau Açominas and Gerdau Internacional explained in Figure 2 above.  *See* ¶5.  As a result, Itaú BBA held a 3.4% stake of the consolidated subsidiary as set forth in Figure 4.



May 06th, 2005:
Date of the Investment. The corporate capital of Gerdau Participações, is increased as Itaú BBA invests:

Fig.3

- 4 -



May 09th, 2005:
Merger of Gerdau Participações into Gerdau Açominas. By means of this transaction,
Gerdau Açominas became the beneficiary for the deduction of the goodwill:

Fig.4

8.      Later, on July 29, 2005, Gerdau Açominas was reorganized into four subsidiaries,

including Gerdau América Latina, Gerdau Aços Especiais, Gerdau Aços Longos and Gerdau

Açominas, with Itaú BBA as a minority shareholder as follows:



July 29th, 2005:
Spin-off of Gerdau Açominas. Resulting companies: Gerdau Aços Longos, Gerdau Aços
Especiais, Gerdau América Latina and Gerdau Açominas ("Subsidiaries"):

Fig.5

9.      Through the transactions and reorganizations dating from 2005 set forth above,

Gerdau took goodwill deductions from October 2005 to June 2010 which totaled R$1.252 billion.

Although Gerdau tried to give the goodwill deductions an air of legitimacy by portraying Itaú BBA's

- 5 -

1197925_1

loan as an equity investment, the Brazilian Department of Federal Revenue ("Federal Revenue") disagreed with the goodwill deductions and, in 2010, assessed unpaid taxes and fines against Gerdau S.A. totaling R$2.191 billion.

**B.**     **Brazil's Tax Litigation Process and the Launching of Operation Zelotes**

10.     Under the Brazilian tax assessment system, there is no method to settle assessments by Federal Revenue.  If Federal Revenue disagrees with a company's deductions and assesses taxes, the taxpayer must either pay the assessment or dispute it.

11.     If the taxpayer chooses to dispute the assessment, there are several levels of administrative review to which the taxpayer will appeal the tax assessed. First, the assessment is reviewed internally at Federal Revenue by a body called the Delegacia Regional de Julgamento, or DRJ.  If the DRJ upholds the assessment, the taxpayer will appeal to CARF.  If the taxpayer is unsuccessful at the first stage within CARF, it can file a final appeal with the Superior Chamber within CARF.

12.     Appeals to CARF are presided over by six councillors who review the appeals.  Three of the councillors are appointed by the appealing taxpayer and three are appointed by Federal Revenue.  Notably, if CARF reaches a final decision in the taxpayer's favor, Federal Revenue is prohibited from pursuing a judicial appeal; conversely, if CARF's decision is against the taxpayer, three levels of judicial review are also available to the dispute the assessment.   Given this cumbersome process, it is extremely time-consuming to resolve disputed tax assessments in Brazil. It is also extremely beneficial to a taxpayer to have the matter resolved in its favor by CARF, because of the finality of that decision.

13.     Brazil's tax litigation process is, according to one federal prosecutor, "a recipe for influence-peddling."  And indeed, in March 2015, Brazilian authorities disclosed the existence of an

- 6 -

ongoing and wide-ranging investigation, dubbed "Operation Zelotes,"[2] into a multi-billion dollar tax fraud scheme at CARF.  Councillors at CARF allegedly accepted bribes, disguised as sham consulting contracts, to cast votes in favor of taxpayers.  Since the three councillors appointed by the appealing taxpayer usually vote in the taxpayer's favor, in order to corrupt the system, only one government-appointed councillor had to be willing to accept a bribe.

14.     A central target of the Operation Zelotes investigation is a lawyer named Jose Ricardo da Silva ("da Silva"), proprietor of J.R. Silva Advogados & Associados.  Evidence in the Zelotes investigation, including transcripts of phone conversations among da Silva's co-conspirators intercepted by Brazilian police, demonstrates that da Silva negotiated bribes and influenced decisions.  In one such intercepted conversation, co-conspirator Paulo Roberto Cortez ("Cortez") states that da Silva "did all kinds of fraud at CARF, he sold decisions."  Cortez also says that at CARF, "big fish" always engage in "negotiations," but the "weak ones" wind up paying the taxes. "With big fish everything passes, everything is tax free, all you need is to pay the fee."  Cortez also referred to CARF as a "trading desk."  Da Silva's sister, Eivanice Canario da Silva, and law partner, Adriana Oliveira e Ribeiro ("Ribeiro"), also colluded to influence CARF decisions in exchange for money.

### C.     Gerdau's Tax Appeals and Implication in Operation Zelotes

15.     In October 2010, Gerdau initiated an administrative proceeding and appealed the tax assessment described at ¶9 to CARF.  Gerdau was desperate to keep the price of its stock artificially inflated because it knew that it was going to have to repurchase the equity held by Itaú BBA to secure the loan made to complete the corporate restructuring in 2005.  Thus, in an effort to secure a

---

[2]   "Zelotes" translates as "Zealots."   "Operation Zelotes" and "Operation Zealots" are used interchangeably herein.

favorable tax decision, Gerdau corrupted CARF councillors presiding over Gerdau's tax appeal by paying bribes to the CARF councillors in exchange for votes in favor of Gerdau.

16.     In April 2012, CARF issued several decisions reversing the taxes assessed on Gerdau, ruling that the Company's goodwill deductions were proper.  These decisions were very unusual in that they ruled almost uniformly in favor of the taxpayer, Gerdau.  These favorable decisions to Gerdau were also unusual given that Federal Revenue's internal review board, the DRJ, had already unequivocally ruled that Gerdau's use of goodwill was improper.  Clearly, Gerdau's efforts to corrupt the CARF system were successful.  Evidence gathered in the Operation Zelotes investigation reveals that Gerdau's success at CARF was due to a "contract" with da Silva, who was a councillor on the Gerdau CARF appeals and a vice president of CARF.

17.     After these favorable rulings for Gerdau in April 2012, Federal Revenue appealed the decisions to the Superior Chamber at CARF, the final level of administrative review.  For this reason, Gerdau continued to bribe CARF councillors after the favorable April 2012 decisions, to ensure that Gerdau's goodwill deductions would be upheld.

18.     There is evidence demonstrating that Gerdau continued to pay da Silva and others to resolve the appeal over its treatment of goodwill in connection with the self-dealing transaction in Gerdau's favor.   In one intercepted phone conversation, Cortez states he was promised R$50,000,000 to "solve the goodwill thing of Gerdau."  Cortez states more than once that "there is a lot of money involved" in this matter.  According to the police report, these intercepted phone conversations related to Gerdau's tax matter number 10680.724392/2010-28, which is the same CARF tax matter resolved in April 2012 in Gerdau's favor.[3]  The taxes, penalties and accumulated

---

[3]     This is also the same tax matter number described in Gerdau's U.S. Securities and Exchange Commission ("SEC") filings and in which CARF ruled against them in July 2016.

interest at issue amounted to almost R$4 billion.  The documents show that during the time da Silva was assigned to the case, CARF reversed a negative ruling from a proceeding in the lower tax court. Ribeiro, da Silva's law partner, was also "engaged" in the case.

19.     The police report also contains email exchanges between da Silva, Ribeiro and Joao Batista Gruginski ("Gruginski"), the head of consulting firm SGR Consultoria Empresarial Ltd., between January 20 and January 27, 2014, in which Gruginski sends da Silva and Ribeiro a series of drafts of the vote that was to be rendered in the Gerdau tax appeal.  These emails also reflect an agreement to meet in person on January 22, 2014 to discuss the case and "make adjustments that are appropriate or required."  On January 27, 2014, Gruginski sends da Silva and Ribeiro a "final version of the draft vote."  In the email transmitting the document, Gruginski discusses the lower court's finding that Gerdau was not entitled to amortize goodwill from the related-party transaction, noting that "at our meeting on Friday, I was supposed to find a way to include the true endorsement by the National Treasur[y] to the goodwill incorporated by the Gerdau Group," but notes that no such endorsement existed; the National Treasury had agreed with the lower court's decision. Nevertheless the draft vote attached to the email reflects that one chamber of CARF had reversed the decision and that da Silva's chamber would do the same.

20.     Da Silva was a councillor for Gerdau's CARF tax appeals until March 2014. Subsequently he was asked to leave CARF, and the police report states that the "serious repercussions at the Federal Revenue and the CARF" from the handling of Gerdau's tax appeals may have been the cause of his departure.  Da Silva stepped down from his position in approximately August 2014, but the police report shows that he continued to organize bribes and influence decisions in pending cases.  An email dated September 19, 2014 shows da Silva continued to be active in analyzing Gerdau's tax case.  According to the police report, he "had interests in the

- 9 -

process of Gerdau Group as much as before, as he has today, and corroborating that he really could be responsible for the . . . connection of the company to CARF, although using partners to intermediate the contact with interested companies."

21.     Transcripts of taped phone conversations make clear that Gerdau's efforts to corrupt the CARF proceedings not only resulted in the favorable rulings from CARF in April 2012, but also thereafter.  Another councillor assigned to the Gerdau matter was Valmar Fonseca de Menezes ("Menezes").  In one conversation Cortez says Menezes "escaped" the voting session in CARF's Lower Chamber, and speculates that Menezes wanted to "avoid" voting in the Lower Chamber and instead vote when the matter reached the Upper Chamber.  Cortez later states that Menezes avoided the vote in the Lower Chamber to avoid suspicion while da Silva was leaving, and that Menezes was now "the owner" of R$50 million.  Cortez says that Menezes returned to CARF when the "largest of the Gerdau processes" was up for decision.  Cortez again refers to the fact that Menezes did not vote in the Lower Chamber, stating that Menezes is "saving real bullets because at the Lower Chamber they are worthless and that the good thing is at the Upper Chamber," which is "what the contract is for."  The "contract" is the R$50 million bribe payment set up by da Silva.

22.     The police report indicates that following da Silva's departure from CARF, the matter was transferred to Valmir Sandri ("Sandri"), who was also in on the scheme.  Intercepted phone conversations show conspirator Cortez stating that despite da Silva's departure, the arrangement with Gerdau continued uninterrupted, and would guarantee a "nice retirement" for Sandri.  In another conversation, Cortez says that he and his co-conspirators are still getting paid for the "contract" that da Silva executed with Gerdau, and that they will all be "drown[ing]" in money, sharing among them R$50,000,000.

- 10 -

**D.      Disclosures Regarding Gerdau's Possible Tax Fraud, but Defendants Vigorously Deny Wrongdoing**

23.      On March 26, 2015, Brazilian authorities announced that up to 70 companies, including Gerdau, were being investigated as part of Operation Zelotes.  On this news, the price of Gerdau stock declined 11.05% on huge volume.  Responding to these developments, Gerdau said that it had not been contacted by any public authority regarding Operation Zealots and stated:  "***The company reiterates that it has rigorous ethical standards in conducting its [legal proceedings] with public agencies***."

24.      Although it was revealed in March 2015 that Gerdau was one of the companies under investigation, it was not until the end of the Class Period that the full extent of Gerdau's knowing and willful participation in the bribery scheme at CARF became apparent.

25.      In the midst of the ongoing Operation Zelotes investigation, on July 14, 2015, Gerdau stunned investors when it announced that it would spend in excess of R$1.98 billion to acquire minority interests in the Company's subsidiaries, in which it already owned over 95% of the controlling interests.  The acquisitions of its own subsidiaries shares were as follows:

| Subsidiary | Number of Shares Acquired | Percentage of the Share Capital of the Subsidiary Acquired |
|---|---|---|
| Gerdau Aços Longos S.A. | 9,569,182 | 4.77% |
| Gerdau Açominas S.A. | 9,569,182 | 3.50% |
| Gerdau Aços Especiais S.A. | 8,805,460 | 2.39% |
| Gerdau América Latina Participações S.A. | 8,805,460 | 4.90% |

26.      In its announcement, the Company stated:  "These acquisitions of equity interests, in the aggregate amount of R$1,986 million, will enable Gerdau S.A. to hold more than 99% of the total capital of each of the subsidiaries . . . ."  News of this seemingly pointless use of corporate assets to purchase such a miniscule minority interest in its own subsidiaries of which the Company already owned in excess of 95%, caused the price of Gerdau securities to decline more than 7.49%

- 11 -

on July 14, 2015 and to continue to decline thereafter as the news was absorbed by the market. This release, however, did not reveal the true nature of the self-dealing transaction from 2005 or the real reasons why Gerdau appeared to waste over R$1.98 billion on subsidiaries it already controlled.

27.     On the next day, July 15, 2015, defendant André Pires de Oliveira Dias resigned from his position as the Company's Chief Financial Officer ("CFO").

28.     On September 25, 2015, an article in the *Brazil Journal* hinted at the negative reaction by minority shareholders to the repurchase transaction. That article stated:

> The outrage by minor shareholders goes back to the end of July when Gerdau announced the disbursement of almost 2 billion reais to repurchase minor interests held in its subsidiaries, in an operation described by investors as 'economically illogical', 'indefensible', and prejudicial to the company.
>
> Initially, Gerdau did not disclose who were the sellers of these shares. After putting the pieces together, minor shareholders found out that the main seller (who was carrying the interest) was Itaú BBA, who had acquired these shares as part of a corporate restructuring operation Gerdau carried out in 2005. The steel company later confirmed that Itaú was one of the sellers.
>
> The main purpose of the corporate reorganization would be to reevaluate the assets of the company, which would help Gerdau to pay less taxes.
>
> To allow this revaluation, Gerdau needed that an independent party – preferably a well-known party – would acquire part of the assets for an amount higher than the value recorded in the balance sheet. That's when Itaú BBA acquired a fraction of the capital of the subsidiaries.
>
> In July, Itaú exercised the right, set forth in an agreement, to sell the interests back to a company of the Gerdau family, INDAC. But Gerdau was the one who bought the shares, which gave rise to the questions by the minor shareholders.

29.     On the heels of this news of Gerdau's self-dealing, on December 4, 2015, a Brazilian publication reported that a committee of the National Congress of Brazil had named Gerdau, along with other companies, as a beneficiary of a tax evasion scheme. On this news, the price of Gerdau ADRs fell $0.11, or 6.96%, to close at $1.47 per ADR on December 4, 2015.

30.     Thereafter, on or around February 25, 2016, Brazilian police raided Gerdau's offices in connection with Operation Zelotes, carrying out some 20 court orders for testimony and 18 search warrants in Recife, Porto Alegre, Rio de Janeiro, Sao Pãulo and Brasília.  Gerdau's CEO, defendant André Gerdau, was among the individuals ordered to testify by day's end.  In an emailed statement, Gerdau stated that the Company had never authorized the use of its name in illegal negotiations and that the Company abided by rigorous ethical standards.

31.     On February 26, 2016, it was reported in the Brazilian media that the stock prices of the parent companies to Gerdau, Gerdau Metalurgica, declined when it was reported that the Operation Zelotes investigation of CARF went back to 2012, the time when the CARF rulings in Gerdau's favor were issued reversing the tax assessments from 2010.  This news also caused Gerdau's stock price to decline by 8.57% over two days from February 25 to February 26, 2016.

32.     Days later, on February 29, 2016, Gerdau announced that it would delay the release of its fourth quarter financial results as the Company "analyze[d] the case records involving Gerdau in the recent phase of [the] Zelotes Operation."

33.     On March 24, 2016, Gerdau released its Management Report in preparation for the upcoming annual shareholders' meeting on April 26, 2016.  In response to that report, because of concerns raised by the minority shareholders irate over the payment of R$1.98 billion to repurchase shares of the Company's subsidiaries, CVM issued Official Communication No. 120/2016-CVM/SEP/GEA-2 which required Gerdau to set forth more details about its transaction with Itaú BBA.  Gerdau refiled its Management Report on April 18, 2016, providing more detailed information regarding the purchase of minority positions of the Company's subsidiaries.  The refiled Management Report included the identities of the entities from which the Company purchased the minority shares:  Itaú BBA and Arcelor, one of the Company's competitors.  The quantity and

- 13 -

percent of shares purchased from each of these companies, broken out by seller, is shown in the following tables:

**Itaú BBA**

| Company | Number of Shares Acquired | Percent of Capital of the Controlled Company |
|---|---|---|
| Gerdau Açominas S.A. | 5,648,201 | 2.24% |
| Gerdau Aços Longos S.A. | 6,138,085 | 3.06% |
| Gerdau Aços Especiais S.A. | 5,648,201 | 1.53% |
| Gerdau América Latina Participações S.A. | 5,648,201 | 3.14% |

**Arcelor**

| Company | Number of Shares Acquired | Percent of Capital of the Controlled Company |
|---|---|---|
| Gerdau Açominas S.A. | 3,157,259 | 1.25% |
| Gerdau Aços Longos S.A. | 3,431,097 | 1.71% |
| Gerdau Aços Especiais S.A. | 3,157,259 | 0.86% |
| Gerdau América Latina Participações S.A. | 3,157,259 | 1.76% |

34.    The revised Management Report also made a stunning disclosure, informing investors for the first time that the repurchase of the shares from Itaú BBA was required because the bank had an option with Indac, the parent company of Gerdau controlled by the Gerdau family.  The revised Management Report stated:

> As already reported by the Company to the CVM, Itaú had an option with Indac – Indústria, Administração e Comércio S.A. ("Indac"), the controlling company of Metalúrgica Gerdau S.A. ("Metalúrgica Gerdau") to sell stakes for a certain price. Metalúrgica Gerdau was the guarantor for Indac in that option.  Gerdau was not tied to those contracts, and went through with the operation believing it was in the interest of the Company.

35.    Even more stunning were the variations in the prices paid by Gerdau for the exact same shares, depending on which company was the seller.  As shown in the following tables, Gerdau paid Itaú nearly three times the price it paid Arcelor for the same shares:

- 14 -

**Itaú**

| Company | Number of Shares Acquired | Total Implicit Value | Price Per Share |
|---|---|---|---|
| Gerdau Açominas S.A. | 5,648,201 | R$416,147,913.61 | R$73.68 |
| Gerdau Aços Longos S.A. | 6,138,085 | R$899,767,327.60 | R$146.59 |
| Gerdau Aços Especiais S.A. | 5,648,201 | R$135,683,093.33 | R$24.02 |
| Gerdau América Latina Participações S.A. | 5,648,201 | R$239,567,360.76 | R$42.41 |

**Arcelor**

| Company | Number of Shares Acquired | Total Implicit Value | Price Per Share |
|---|---|---|---|
| Gerdau Açominas S.A. | 3,157,259 | R$72,586,209.14 | R$22.99 |
| Gerdau Aços Longos S.A. | 3,431,097 | R$156,941,082.70 | R$45.74 |
| Gerdau Aços Especiais S.A. | 3,157,259 | R$23,666,396.17 | R$7.50 |
| Gerdau América Latina Participações S.A. | 3,157,259 | R$41,786,311.99 | R$13.23 |

36.      On April 18, 2016, in response to this stunning disclosure, which for the first time informed investors that Gerdau paid over R$1.98 billion for an option obligation of the parent company, Indac, to purchase the equity of subsidiaries of which it already owned 95% at prices three to four times what another company received for the stock in the same transaction, the price of Gerdau stock declined 7.24% on very heavy volume.

37.      Then, on May 16, 2016, various news outlets reported that Brazil's federal police had accused Gerdau of evading nearly R$4 billion in taxes. A total of 19 people were indicted in connection with CARF's treatment of Gerdau's tax appeals – including CEO André Gerdau and corporate counsel Luz – on corruption related charges, including bribery, money laundering and influence peddling.  Also indicted were CARF councillors responsible for the suspect decisions, including da Silva, Menezes and Sandri.

- 15 -

38.     As a result of this news, the price of Gerdau ADRs fell $0.13, or over 7%, to close at $1.72 per ADR on May 16, 2016.

39.     After the end of the Class Period, further information regarding Gerdau's tax appeals was revealed.  On June 13, 2016, it was revealed in the Brazilian media that as a result of the Operation Zealots investigation, all four CARF decisions ruling on Gerdau's goodwill deductions had been suspended.  Three of those decisions from April 2012 went in Gerdau's favor and were being appealed by the Ministry of Finance.  Another decision from 2014 ruled that the Company's goodwill deductions were improper and upheld the taxes assessed and was being appealed by Gerdau.  The article indicated that during the time the favorable rulings to Gerdau were issued by CARF in April 2012, one of the presiding CARF councillors was da Silva.  That article also noted that an investigator from the Ministry of the Economy, Marco Aurelio Zortea Marques, confirmed that the decisions favorable to Gerdau from April 2012 are practically the only victories obtained by a taxpayer at CARF.

40.     On July 13, 2016, Brazilian media reported that Gerdau faces an R$3.8 billion fine after losing battle at the Tax Appeals Board.  That article stated:

> The Gerdau Group faced a bitter defeat on Thursday in its last appeal at the Tax Appeals Board (Carf).  The case, which points to irregular practices in the use of goodwill, is under the scope of Operation Zelotes, which investigates a vote-buying scheme in the administrative court.  The Superior Chamber upheld four tax assessments related to a restructuring carried out by the steelmaker group in 2004.  The court supported the Finance Ministry's arguments on the so-called internal goodwill, generated from transactions made between the group's units to have a deduction in income and social contribution taxes.  The company reported to the Securities and Exchange Commission of Brazil that it would not make provisions for the losses suffered in the trial, which total R$3.77 billion, and says it will appeal the ruling in court.

1197925_1

## III.    JURISDICTION AND VENUE

41.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) as the claims asserted herein arise under and pursuant to §§10(b) and 20 of the Exchange Act (15 U.S.C. §§78j(b) and 78t) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

42.     Venue is proper pursuant to §27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District.  Furthermore, the Company's ADRs trade on the NYSE, which is located in this District.

43.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails, interstate telephone communications and the facilities of the NYSE.

## IV.    PARTIES

44.     Lead Plaintiff Chicago Police provides retirement benefits to the sworn police members of the Chicago Police department, and their spouses and children.  As of 2015, Chicago Police had approximately 12,061 members.  Lead Plaintiff purchased 681,278 Gerdau ADRs during the Class Period, and was damaged thereby.

45.     Defendant Gerdau S.A. is a publicly traded corporation with its corporate domicile in the city of Rio de Janeiro, Brazil.  Gerdau is one of the world's largest suppliers of steel.  Gerdau has industrial operations in 14 countries in the Americas, Europe and Asia.  Gerdau is listed on the São Paulo, New York and Madrid stock exchanges.  The Company is managed by its Board of Directors through an Executive Committee who coordinates and supervises the Company's business operations and processes according to policies set by the Board of Directors.

- 17 -

46.     Defendant Jorge Gerdau Johannpeter ("Jorge Gerdau") was the Chairman of Gerdau's Board of Directors from 1983 until April 30, 2015, after which he served on the Board of Directors in an advisory capacity.  He began working for Gerdau in 1954, became an executive officer in 1971, and became a member of the Board of Directors in 1973.  Throughout the Class Period, Jorge Gerdau also served as a member of the Board of Directors of Petroleo Brasileiro S.A., a.k.a. Petrobras.  At all relevant times, he was also a member of the Economic and Social Development Council ("CDES"), an advisory body to the Brazilian government.

47.     Defendant André Bier Gerdau Johannpeter ("André Gerdau") is, and was at all relevant times, Gerdau's CEO.  He is also the President of the Gerdau Executive Committee and has been a member of the Company's Board of Directors since 2008.  He has worked for Gerdau since 1980.  He is the son of defendant Jorge Gerdau.  In May 2016, André Gerdau was indicted in Brazil on charges of corruption, money laundering and influence peddling.

48.     Defendant Claudio Gerdau Johannpeter ("Claudio Gerdau") served as Gerdau's Chief Operating Officer from 2007 until August 27, 2012.  He has been a member of Gerdau's Board of Directors since 2008, and became Chairman of the Board in 2015.  He has worked for Gerdau since 1982.  He is the nephew of defendant Jorge Gerdau.

49.     Defendant Osvaldo Burgos Schirmer ("Schirmer") was the Company's CFO and Investor Relations Officer from 1987 until his retirement on December 31, 2012.  From 2002 until his retirement, he was a member of Gerdau's Executive Committee.  He began his career with Gerdau in 1986.

50.     Defendant Expedito Luz ("Luz") was, at all relevant times, the Executive Vice President of Legal and Compliance at Gerdau, as well as a member of its Executive Committee.  He

- 18 -

began his career at Gerdau in 1976.  In May 2016, Luz was indicted in Brazil on charges of corruption, money laundering and influence peddling.

51.   Defendant André Pires de Oliveira Dias ("Dias") succeeded Schirmer as Gerdau's CFO and Investor Relations Officer, and held that position from January 1, 2013 until his resignation on July 15, 2015.

52.   Defendant Harley Lorentz Scardoelli ("Scardoelli") became the Company's Investor Relations Director on July 15, 2015, at which time he assumed responsibility for the Investor Relations, Accounting, Tax and Legal departments.  Scardoelli joined Gerdau in May 1988.

53.   Defendant Renato Gasparetto Jr. ("Gasparetto") was, at all relevant times, Gerdau's Corporate Communications & Public Affairs Director, and was a member of Gerdau's Disclosure Committee.

54.   The defendants identified in ¶¶46-53 are referred to herein as the "Individual Defendants."

## V.   DEFENDANTS' FRAUDULENT SCHEME AND MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

55.   Defendants' fraudulent scheme and false and misleading statements operated as a fraud or deceit on purchasers of Gerdau ADRs, as they: (i) deceived the investing public regarding Gerdau's financial condition, operations and compliance with the law; (ii) artificially inflated the price of Gerdau ADRs; and (iii) caused Lead Plaintiff and other members of the Class (as defined herein) to purchase Gerdau ADRs at artificially inflated prices.

### A.   False Statements in 2012

#### 1.   2011 Form 20-F

56.   On April 23, 2012, the first day of the Class Period, Gerdau filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2011 (the "2011

Form 20-F"). Defendants reported net income of R$2.1 billion. Gross profit was R$5.1 billion and diluted earnings per share ("EPS") on common shares was R$1.22.

57.     According to the 2011 Form 20-F, the Company prepared the consolidated financial statements presented therein "in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB)."

58.     In the 2011 Form 20-F, defendants highlighted their commitment to "good corporate governance practices" and "strengthening the stock markets" by providing investors with a "fast and efficient flow of data:"

> ***Gerdau has a historical commitment to good corporate governance practices and to strengthening the stock markets*** . . . .
>
> Furthermore, the Group's listed companies also have ***an information disclosure policy that defines the criteria guiding investor relations, including the announcement of relevant acts and facts***. ***The aim is to maintain a fast and efficient flow of data*** while respecting rules of secrecy and confidentiality. This policy covers controlling shareholders, officers and managers, members of the Board of Directors and Board of Auditors and any organs or persons with technical or consultative functions which, as a result of their responsibilities, function or position, have access to information concerning the Group.

59.     The 2011 Form 20-F advised investors of the status of ongoing tax and other legal matters affecting the Company, and their likely impact on Gerdau's financial results:

Legal Proceedings

*       *       *

> Like other Brazilian companies, Gerdau and its subsidiaries are party to proceedings with respect to tax, labor and civil matters, most of them arising in the regular course of business. ***Based on advice from legal counsel, management believes that the reserve for provisions is sufficient to meet probable and reasonably estimable losses in the event of unfavorable rulings***, and that the ultimate resolution will not have a significant effect on its consolidated financial position of December 31, 2011.

60.     In addition, Gerdau described "other contingent tax liabilities" for which it had not made any reserve provisions. Among them was an ongoing dispute with the Brazilian tax authorities

- 20 -

regarding the Company's accounting for goodwill in connection with the corporate reorganization described at ¶¶5-8 (the "goodwill tax dispute").  Specifically, the Company stated:

> There are ***other contingent tax liabilities, for which the probability of losses are not probable and, therefore, are not recognized in the provision for contingencies***.  These claims are comprised by:
>
> *     *     *
>
> The Company subsidiaries, Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A., Gerdau Comercial de Aços S.A. and Gerdau Açominas S.A., have administratively challenged the disallowance of the deductibility of a premium generated through a corporate reorganization in 2005, in accordance with articles 7 and 8 of Law no. 9532/97.  The premium was deducted from the tax bases of the income tax and social contribution on profits in the 2005-2010 period.  The total updated amount under discussion is R$2,664 million.  ***No reserve for contingency was established, since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible***.

61.     Also in the 2011 Form 20-F, defendants confirmed their responsibility for maintaining adequate internal controls:

> ***The management of Gerdau S.A. is responsible for the implementation, effectiveness and maintenance of an effective system of internal control over the Consolidated Financial Statements*** as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934.  The Company's internal control is a process designed to provide reasonable assurance regarding the reliability and the preparation of the Consolidated Financial Statements for external purposes in accordance with generally accepted accounting principles.
>
> Management assessed the effectiveness of the Company's internal control over Consolidated Financial Statements as of December 31, 2011, based on the criteria established in "Internal Control – Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").  ***Based on that assessment, Management concluded that, as of December 31, 2011, the Company's internal control over financial reporting is effective***.

62.     In the 2011 Form 20-F, the Company described its internal controls procedures, including the formation of a "Disclosure Committee," which was tasked with "oversee[ing] and review[ing] all materials for which there is a legal disclosure requirement," as well as "all data required to support" those disclosures:

- 21 -

Disclosure control and procedures

The Company has carried out an evaluation of the effectiveness of the design and operations to assurance the objectives achievement of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Security Exchange Act of 1934) under the supervision of its management, which is responsible for the management of the internal controls, and includes its Chief Executive Officer and Chief Financial Officer. . . . Therefore, ***based upon the Company's evaluation as of December, 31th of 2011, the Company's management concluded that the design and operation of the Company's disclosure controls and procedures are effective*** at the reasonable assurance level.

Gerdau S.A. has a Disclosure Committee composed of the Chief Executive Officer, André Bier Gerdau Johannpeter, the Chief Financial Officer and Investor Relations Executive Officer, Osvaldo Burgos Schirmer, the Executive Vice President, Legal and Compliance, Expedito Luz, the Accounting Director, Geraldo Toffanello, the Financial Director, Harley Scardoelli and the Corporate Communication & Public Affairs Director, Renato Gasparetto Junior. ***This Committee oversees and reviews all materials for which there is a legal disclosure requirement, together with all data required to support the documents mentioned above. This committee meets at regular intervals in order to review all data***.

63.     The Company assured investors that for the fiscal year ended December 31, 2011, "[n]o changes in the Company's internal controls over Financial Reporting occurred during the period covered by this report that materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting."

64.     In the 2011 Form 20-F, the Company explained that effective in 2011, it had adopted a new Code of Ethics, whose provisions were "binding on Gerdau's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, and other persons performing similar functions." The Code of Ethics, filed as an exhibit to the 2011 Form 20-F and available on the Company's website, stated that:

This Code of Ethics contains the primary business ethics guidelines for conducting our operations. It is applicable to employees at all operations . . . . ***We expect that our leaders and employees will act in accordance with . . . this Code***.

65.     The Code of Ethics explicitly prohibits improper relationships with government authorities, noting their harmful effects on both the Company and the community at large:

1197925_1

**IMPROPER PAYMENTS AND RELATIONSHIPS WITH GOVERNMENTS**

*Corruption harms society in many different ways*, damaging a country's political, economic and social well-being.

*It is strictly prohibited to use Company funds or assets to grant unlawful or improper benefits, payments or transfers of anything of value (including services or entertainment) to government personnel and other officials to improperly obtain or retain business, or for any other improper purpose or business advantage*.

*This prohibition applies to direct or indirect payments (made through third parties) and is intended to prevent bribes, kickbacks or any other form of benefit in exchange for an improper advantage*.

*An illegal or improper payment can devastate the Company's image*, apart from creating civil and in certain cases even criminal liability to the Company and employees involved.  Some laws on the matter have very broad definitions of "bribery" and one can be prosecuted for not being aware that the action practiced is considered a crime.  Also, an increasing number of countries have laws prohibiting bribery even when it is committed outside of those countries' own borders.

66.    The 2011 Form 20-F was signed by André Gerdau and Schirmer.

67.    The 2011 Form 20-F was certified, pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), by André Gerdau, who certified that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

68.    André Gerdau and Schirmer further certified the 2011 Form 20-F, stating:

1.    I have reviewed this annual report on Form 20-F of Gerdau S.A.;

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition*, *results of operations and cash flows of the company* as of, and for, the periods presented in this report;

- 23 -

4.      The company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

> (a)      Designed such disclosure controls and procedures . . . to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us . . . ;
>
> (b)      Designed such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting . . . ;
>
> *          *          *

5.      The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

> (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and
>
> (b)      ***Any fraud***, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

**Reasons Why Statements in ¶¶56-68 Were Knowingly False and Misleading**

69.      The 2011 Form 20-F, and the representations about Gerdau's risk factors, business developments, governmental policies, income tax related obligations and expenses, financial statements, transparency with investors, and disclosure and internal controls contained therein, were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

> (a)      contrary to statements that the Company operated under "strict ethical principles," Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an

- 24 -

on-going, multi-year conspiracy to illegally evade income taxes by bribing officials of CARF and engaging in other crimes to secure tax rulings in Gerdau's favor;

   (b)  contrary to statements that the Company was committed to maintaining "a relationship of transparency" with investors, Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to conceal the true nature of the corporate restructuring transactions from 2005, in which Gerdau borrowed money from Itaú BBA, secured by equity in the Company's subsidiaries and a put option requiring the parent company controlled by the Gerdau family, Indac, to repurchase the equity.  Those corporate restructuring transactions were used to create the bogus goodwill deductions at issue in the tax bribery scheme;

   (c)  Gerdau was then the subject of an ongoing dispute with Brazil's tax authorities over its improper accounting for goodwill related to the 2005 corporate restructuring, which the DRJ had already determined to be improper; but for Gerdau's bribes, an adverse ruling from CARF on this dispute was more than "merely possible," but indeed was likely, and the reserves for contingent tax liabilities were woefully inadequate to cover the unpaid taxes, penalties, fines and interest of over R\$2 billion;

   (d)  the unlawful practices perpetrated by Gerdau and its executive officers subjected the Company to numerous known, but undisclosed, risks, including monetary risk, reputational risk, risks associated with retention and/or renewal existing contracts, risks associated with the Company's international expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities and even a compulsory dissolution of Gerdau as a legal entity;

(e)     the unlawful practices perpetrated by defendants were in direct violation of the Company's Code of Ethics, which defendants represented guided their operations and by which executives of the Company were bound;

(f)     Gerdau's disclosure controls and procedures were either inadequately designed and insufficient to ensure that improper payments to tax authorities to waive or reduce Gerdau's tax liabilities was made known to defendants, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that André Gerdau, Schirmer, Luz, Scardoelli and Gasparetto were unaware of such improper payments, but they failed to disclose these material facts;

(g)     Gerdau's financial statements had not been prepared in conformity with International Financial Reporting Standards ("IFRS") (*see* ¶¶298-327) and, *inter alia*, materially understated the Company's tax liabilities and materially overstated the Company's net income;

(h)     the unlawful practices perpetrated by Gerdau and its executive officers were reasonably likely to have a material adverse effect on the Company's future operating results; and

(i)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about Gerdau's then-current business and future financial prospects.

### 2.     1Q12 Quarterly Results

70.     On May 2, 2012, Gerdau issued a press release purporting to report its financial results for the first quarter of 2012 (the "1Q12 Press Release").  The Company reported R$397 million in net income for the quarter.

71.     The Company represented that its 1Q12 Consolidated Financial Statements were prepared in accordance with IFRS.

- 26 -

72.     On May 3, 2012, a copy of the 1Q12 Press Release was filed with the SEC on Form 6-K, signed by Schirmer.

73.     The same day, May 3, 2012, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Schirmer repeated the quarterly financial results as presented in the 1Q12 Press Release.

3.     **2011 Annual Report**

74.     Also in the 1Q12 Press Release, Gerdau informed investors that its Annual Report for 2011 (the "2011 Annual Report") was available on its website.

75.     In the 2011 Annual Report, Gerdau represented that it "ha[d] built its history on the foundation of *integrity*, consistency, and professionalism," and sought to "establish a direct relationship of mutual gains with its shareholders . . . ." The Company attributed its "solid and consistent growth" to its "[e]thical values" and "professional management:"

> In 2011, Gerdau celebrated 110 years of existence consolidating its path of sustainable development in the steel industry. *Ethical values*, professional management, financial austerity, along with industrial and commercial competitiveness *were the basis for the Company's solid and consistent growth* and today it is the leader in the segment of long steels in the Americas and one of the largest special steel supplier in the world.

76.     The Company also informed shareholders of its executives' focus on and participation in the revised Code of Ethics:

> GERDAU CORPORATE CULTURE AND ETHICS

> In order to strengthen its corporate culture, *Gerdau revised and updated its Vision, Mission, and Values at a global level. The completion of this work was made based on interviews with members of the Board of Directors, Gerdau's Executive Committee, and with the company's main leaders*. . . .

> In addition, the Company launched its new Code of Ethics and promoted the training of more than 45,000 employees in the countries where it operates. *The new code reinforces Gerdau's commitments and expected behavior with regard to each of the values, thus becoming an important instrument for maintaining these concepts and the Company's longevity*.

77.     The new Code of Ethics, which was available on Gerdau's website, specifically prohibited improper payments to, and relationships with, government officials, as described *supra* at ¶64.

78.     In the 2011 Annual Report, the Company stated that its "values" and "strict ethical principles" were "fundamental" to Gerdau's success:

> **Century-old values and a solid management structure are the basis of Gerdau's actions**
>
> . . . With 110 years of history, ***the Company guides its conduct by century-old values and strict ethical principles, fundamental to a relationship of transparency with its stakeholders and to continue its path of sustainable development***.

79.     The 2011 Annual Report also reported the Company's financial results for the year, as summarized from the 2011 Form 20-F.

### 4.     1Q12 Quarterly Report

80.     On May 21, 2012, Gerdau filed its consolidated interim financial statements on Form 6-K for the quarter ended March 31, 2012 (the "1Q12 Form 6-K").  The 1Q12 Form 6-K repeated the financial results contained in the 1Q12 Press Release.

81.     The Company represented that the financial statements contained in the 1Q12 Form 6-K were "prepared in accordance with International Accounting Standard (IAS) No. 34," and further that its annual financial statements for 2011 were "prepared in accordance with International Financial Reporting Standards."

82.     In the 1Q12 Form 6-K, the Company reported a R$722.2 million reserve for contingent tax liabilities, stating that:

> The Company and its subsidiaries are parties to judicial and administrative proceedings involving tax, labor and civil matters.  ***Based on the opinion of its legal advisors, Management believes that the Provisions recorded for these judicial and administrative proceedings is sufficient to cover probable and reasonably estimable losses from unfavorable court decisions, and that the final decisions will not have***

- 28 -

*significant effects on the financial position, operating results and liquidity of the Company* and its subsidiaries.

83.     The 1Q12 Form 6-K was signed by Schirmer.

### 5.     2Q12 Quarterly Results

84.     On August 2, 2012, the Company issued a press release, purporting to report Gerdau's financial results for the second quarter of 2012 ("2Q12 Press Release"). The press release noted net income of R$549 million for the quarter.

85.     Also on August 2, 2012, a copy of the 2Q12 Press Release was filed with the SEC on Form 6-K, signed by Schirmer.

86.     The same day, August 2, 2012, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Schirmer repeated the quarterly financial results as presented in the 2Q12 Press Release.

87.     On August 20, 2012, Gerdau filed its consolidated interim financial statements on Form 6-K for the quarter ended June 30, 2012 (the "2Q12 Form 6-K"). The 2Q12 Form 6-K repeated the financial results contained in the 2Q12 Press Release.

88.     The Company represented in both the 2Q12 Press Release and the 2Q12 Form 6-K that the second-quarter financial statements were prepared in accordance with IFRS.

89.     In the 2Q12 Form 6-K, the Company reported a R$771.9 million reserve for contingent tax liabilities. As before, defendants represented that this reserve was "***sufficient to cover probable and reasonably estimable losses from unfavorable court decisions***." Defendants further represented that the "final decisions" on contingent matters would not materially impact the Company's financial position.

90.     The 2Q12 Form 6-K was signed by Schirmer.

6.    **3Q12 Quarterly Results**

91.    On November 1, 2012, the Company issued a press release that purported to present its financial results for the third quarter of 2012 (the "3Q12 Press Release").  The press release noted net income of R$408 million for the quarter.

92.    Also on November 1, 2012, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended September 30, 2012 (the "3Q12 Form 6-K").  The Company reported R$408 million net income for the quarter.

93.    The Company represented in both the 3Q12 Press Release and the 3Q12 Form 6-K that the Company's quarterly financial statements were prepared in accordance with IFRS.

94.    The 3Q12 Form 6-K reflected a reserve of R$823 million for contingent tax liabilities, and again stated that such reserve was "sufficient" to satisfy any losses arising from these contingent matters, which would not materially impact the Company's financial position.

95.    The 3Q12 Form 6-K was signed by Schirmer.

96.    On November 6, 2012, a copy of the 3Q12 Press Release was filed with the SEC on Form 6-K, signed by Schirmer.

**Reasons Why Statements in ¶¶70-96 Were Knowingly False and Misleading**

97.    The press releases, public statements and financial reports described above, and the representations about Gerdau's risk factors, business developments, governmental policies, income tax related obligations and expenses, financial statements, transparency with investors, and disclosure and internal controls contained therein, were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

(a)      contrary to statements that the Company operated under "strict ethical principles," Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to illegally evade income taxes by bribing officials of CARF and engaging in other crimes to secure tax rulings in Gerdau's favor;

(b)      contrary to statements that the Company was committed to maintaining "a relationship of transparency" with investors, Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to conceal the true nature of the corporate restructuring transactions from 2005, in which Gerdau borrowed money from Itaú BBA, secured by equity in the Company's subsidiaries and a put option requiring the parent company controlled by the Gerdau family, Indac, to repurchase the equity.  Those corporate restructuring transactions were used to create the bogus goodwill deductions at issue in the tax bribery scheme;

(c)      Gerdau was then the subject of an ongoing dispute with Brazil's tax authorities over its improper accounting for goodwill related to the 2005 corporate restructuring, which the DRJ had already determined to be improper; but for Gerdau's bribes, an adverse ruling from CARF on this dispute was more than "merely possible," but indeed was likely, and the reserves for contingent tax liabilities were woefully inadequate to cover the unpaid taxes, penalties and fines of nearly R$2 billion;

(d)      the unlawful practices perpetrated by Gerdau and its executive officers subjected the Company to numerous known, but undisclosed, risks, including monetary risk, reputational risk, risks associated with retention and/or renewal existing contracts, risks associated with the Company's international expansion efforts, risks associated with key employee retention,

and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities and even a compulsory dissolution of Gerdau as a legal entity;

(e)     the unlawful practices perpetrated by defendants was in direct violation of the Company's Code of Ethics, which defendants represented guided their operations and by which executives of the Company were bound;

(f)     Gerdau's disclosure controls and procedures were either inadequately designed and insufficient to ensure that improper payments to tax authorities to waive or reduce Gerdau's tax liabilities was made known to defendants, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that André Gerdau, Schirmer, Luz, Seardbelli and Gasparetto were unaware of such improper payments, but they failed to disclose these material facts;

(g)     Gerdau's financial statements had not been prepared in conformity with IFRS (*see* ¶¶298-327) and, *inter alia*, materially understated the Company's tax liabilities and materially overstated the Company's net income;

(h)     the unlawful practices perpetrated by Gerdau and its executive officers were reasonably likely to have a material adverse effect on the Company's future operating results; and

(i)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about Gerdau's then-current business and future financial prospects.

**B.     False Statements in 2013**

1.     **4Q12 Quarterly Results**

98.     On February 21, 2013, the Company issued a press release, purporting to report Gerdau's financial results for the fourth quarter of 2012 ("4Q12 Press Release").  The press release noted net income of R$143 million for the quarter.

- 32 -

99.     The Company represented that its 4Q12 Consolidated Financial Statements were prepared in accordance with IFRS.

100.    Also on February 21, 2013, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the 4Q12 Press Release.

101.    On February 26, 2012, a copy of the 4Q12 Press Release and related financial statements was filed with the SEC on Form 6-K, signed by Dias.

### 2.     **2012 Management Report**

102.    On February 27, 2013, Gerdau filed its "Management Report" reporting on the Company's financial results and operations for the year ended December 31, 2012 on Form 6-K (the "2012 Management Report"). The Company reported net income of R$1.5 billion for the fiscal year.

103.    The Company represented that its Consolidated Financial Statements were presented in accordance with IFRS.

104.    The 2012 Management Report touted the Company's "Social and Environmental Responsibility," identifying Gerdau's "values, history and attitudes" as "the foundation for the Company's century-long existence":

> *Gerdau's business culture, which is formed by values, history and attitudes*, is shared by its more than 45,000 employees and *serves as the foundation for the Company's century-long existence*. Business knowledge, a results orientation, the continuous pursuit of customers' needs, quality, commitment, integrity, safety, social responsibility and recognition are concepts *that permeate Gerdau's day-to-day activities and have helped the Company consolidate its position in the global steel industry*.

105.    The 2012 Management Report was signed by Dias.

- 33 -

3.    **2012 Form 20-F**

106.    On March 28, 2013, Gerdau filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2012 (the "2012 Form 20-F"). Defendants reported net income of R$1.49 billion. Gross profit was R$4.74 billion and diluted EPS on common shares was R$0.84.

107.    According to the 2012 Form 20-F, the Company prepared the consolidated financial statements presented therein in accordance with IFRS.

108.    In the 2012 Form 20-F, the Company once again highlighted its "commitment" to "good corporate governance practices" and "strengthening the stock markets."

109.    The Company again advised investors of its ongoing legal proceedings and their potential impact on Gerdau's financial results in the 2012 Form 20-F, repeating that the Company had created a sufficient reserve in the event of "unfavorable rulings."

110.    Regarding the Company's ongoing goodwill tax dispute, the Company repeated the statements in ¶60 above, including the statement that "*No reserve for contingency was established, since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible*."

111.    The Company similarly stated in the notes to the financial statements contained in the 2012 Form 20-F that the probability for loss associated with the goodwill tax dispute was only "possible":

> The Company and its subsidiaries, Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A., Gerdau Comercial de Aços S.A. and Gerdau Açominas S.A., discuss, administratively, the disallowance of the deductibility for income tax and social contribution purposes of goodwill related to the reorganization carried out in 2004/2005, pursuant to article 7 and 8 of Law 9532/97. The total updated amount of the discussions is R$2,771,213. *A provision was not recorded for this contingency since its probability for loss is classified as possible by management with the assistance of its legal advisors*.

- 34 -

112.    The Company's by-laws, appended to the 2012 Form 20-F, charged the Board of Directors with "manag[ing the Company] with *zeal for ethical integrity, values and for the attendance of the laws and regulating norms which the Company is submitted*."

113.    In the 2012 Form 20-F, the Company described its disclosure controls procedures in a measure substantially similar to that described in ¶62.  At the time of this filing, the Disclosure Committee members were: André Gerdau, Dias, Luz, Scardoelli and Gasparetto.

114.    The Company represented that during the period covered by the 2012 Form 20-F, there had been "[n]o changes in the Company's internal controls over Financial Reporting . . . that materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting."

115.    The Company further stated that "there ha[d] been no significant changes in the Company's internal controls or in other factors that materially affected these controls subsequent to the date of their most recent evaluation."

116.    The 2012 Form 20-F reiterated that all of Gerdau's business units were subject to its Code of Ethics, and that the "*provisions of the Code are . . . binding on Gerdau's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Compliance Officer and other persons performing similar functions*."   As described in ¶65, the Code of Ethics expressly prohibited improper relationships with, and payments to, government officials.  According to the 2012 Form 20-F, "[t]he Code of Ethics [was] *focused on the ethics and compliance issues most important to a publicly-held company*."

117.    The 2012 Form 20-F was signed by André Gerdau and Dias.

- 35 -

118.    André Gerdau and Dias certified the 2012 Form 20-F pursuant to Sarbanes-Oxley, stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

119.    André Gerdau and Dias further certified the 2012 Form 20-F in a manner identical to that described at ¶68.

4.    **1Q13 Quarterly Results**

120.    On May 7, 2013, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended March 31, 2013 (the "1Q13 Form 6-K").  The Company reported R$159 million net income for the quarter.

121.    In the 1Q13 Form 6-K, the Company reported an R$912 million provision for contingent tax liabilities, stating:

> The Company and its subsidiaries are party in judicial and administrative proceedings involving labor, civil and tax matters. ***Based on the opinion of its legal counsel, Management believes that the provisions recorded for these judicial and administrative proceedings is sufficient to cover probable and reasonably estimable losses from unfavorable court decisions, and that the final decisions will not have significant effects on the financial position and operational results of the Company*** and its subsidiaries.

122.    The Company represented that the financial statements contained in the 1Q13 Form 6-K were prepared in accordance with IFRS.

123.    The 1Q13 Form 6-K was signed by Dias.

124.    The same day, May 7, 2013, the Company issued a press release that repeated the financial results presented in the 1Q13 Form 6-K.  A copy of the press release was filed with the SEC on Form 6-K, signed by Dias.

125.    Also on May 7, 2013, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the press release.

5.    **2012 Annual Report**

126.    Also in the May 7, 2013 press release, the Company announced that its Annual Report for fiscal year 2012 (the "2012 Annual Report") was available on Gerdau's website.

127.    In his letter to shareholders in the 2012 Annual Report, Jorge Gerdau expressed his confidence that the Company's "values" and "integrity" would help Gerdau "transform challenges into new business opportunities":

> We face an increasingly competitive environment, rising costs of raw materials, excess installed capacity, and exchange rate policies practiced by countries to artificially devalue their currencies in order to extend their gains with export.  At Gerdau, this was no different.  However, our centennial experience and long-term strategy give us the confidence and reassurance that we will once again transform challenges into new business opportunities.
>
> ***This certainty is based on our ability to work and the dedication of our more than 45,000 employees who share the Company's values.  This translates into a behavior of integrity, continuous search for excellence, and proximity with all stakeholders***:  employees, customers, ***shareholders***, suppliers, and the community.

128.    The Company's "strict ethical principles" and "transparency with stakeholders" were once again lauded in the 2012 Annual Report:

> ***A solid governance structure and transparency with our stakeholders are at the core of Gerdau***
>
> ***Gerdau follows strict ethical principles*** that have been consolidated along its centennial trajectory, and it is continually striving to improve its relationship with all of its stakeholders.  It has a solid governance structure and uses modern management tools that make it possible to build business opportunities, achieve increasing levels of excellence and competitiveness, as well as ***achieve the highest quality in everything it does***.

- 37 -

129.   The 2012 Annual Report made clear that Gerdau's "corporate culture," "values," and "attitudes" were key to the Company's ability to "respond[]" to a challenging economic environment:

> *Gerdau's corporate culture is the base for the efficiency needed to face the global challenges*
>
> *Gerdau's corporate culture, made up of values, history, and attitudes, is shared by its more than 45,000 employees*.  And this is what forms the basis of the existence of this centennial Company.  Knowledge of the business, focus on results, continuous search for customer preference, quality, commitment, *integrity*, safety, *social responsibility*, and recognition are concepts that permeate daily operations and contribute toward Gerdau building new business opportunities and consolidating itself in the global steel market.
>
> Strengthening this culture, which was one of the main highlights in the area of human resources in 2012, has contributed toward the Company responding to the challenges posed by the current global economic scenario in an increasingly integrated and agile way.

130.   The 2012 Annual Report also reported the Company's financial results for the year, as summarized from the 2012 Form 20-F.

### 6.    **2Q13 Quarterly Results**

131.   On August 1, 2013, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended June 30, 2013 (the "2Q13 Form 6-K").  The Company reported R$400 million net income for the quarter.

132.   In the 2Q13 Form 6-K, the Company reported an R$963 million provision for contingent tax liabilities, and again assured investors that this provision was "*sufficient to cover probable and reasonably estimable losses from unfavorable court decisions*" and further that "*the final decisions will not have significant effects on the financial position and operational results of the Company* and its subsidiaries."

133.   The Company represented that the financial statements contained in the 2Q13 Form 6-K were prepared in accordance with IFRS.

134.    The 2Q13 Form 6-K was signed by Dias.

135.    The same day, August 1, 2013, the Company issued a press release that repeated the financial results presented in the 2Q13 Form 6-K.  A copy of the press release was filed with the SEC on Form 6-K, signed by Dias.

136.    Also on August 1, 2013, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the press release.

7.    **3Q13 Quarterly Results**

137.    On October 31, 2013, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended September 30, 2013 (the "3Q13 Form 6-K").  Gerdau reported R$641.6 million in net income for the quarter.

138.    The Company reported an R$1.02 billion provision for contingent tax liabilities.  The Company reassured investors that this provision was "***sufficient to cover probable and reasonably estimable losses from unfavorable court decisions***" and further that "***the final decisions will not have significant effects on the financial position and operational results of the Company*** and its subsidiaries."

139.    According to the 3Q13 Form 6-K, the financial statements contained therein as well as Gerdau's Consolidated Financial Statements as of December 31, 2012 were "prepared in accordance with International Financial Reporting Standards."

140.    The 3Q13 Form 6-K was signed by Dias.

141.    The same day, October 31, 2013, the Company issued a press release that repeated the quarterly financial results presented in the 3Q13 Form 6-K. A copy of the press release was filed with the SEC on Form 6-K, also signed by Dias.

- 39 -

142.    Also on October 31, 2013, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the press release.

**Reasons Why Statements in ¶¶98-142 Were Knowingly False and Misleading**

143.    The press releases, public statements and financial reports described above, and the representations about Gerdau's risk factors, business developments, governmental policies, income tax related obligations and expenses, financial statements, integrity, strict ethical standards, and disclosure and internal controls contained therein, were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

(a)    contrary to statements that the Company operated under "strict ethical principles," Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to illegally evade income taxes by bribing officials of CARF and engaging in other crimes to secure tax rulings in Gerdau's favor;

(b)    contrary to statements that the Company was committed to maintaining "a relationship of transparency" with investors, Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to conceal the true nature of the corporate restructuring transactions from 2005, in which Gerdau borrowed money from Itaú BBA, secured by equity in the Company's subsidiaries and a put option requiring the parent company controlled by the Gerdau family, Indac, to repurchase the equity.  Those corporate restructuring transactions were used to create the bogus goodwill deductions at issue in the tax bribery scheme;

- 40 -

(c)     Gerdau was then the subject of an ongoing dispute with Brazil's tax authorities over its improper accounting for goodwill related to the 2005 corporate restructuring, which the DRJ had already determined to be improper; but for Gerdau's bribes, an adverse ruling from CARF on this dispute was more than "merely possible," but indeed was likely, and the reserves for contingent tax liabilities were woefully inadequate to cover the unpaid taxes, penalties and fines of nearly R$3 billion;

(d)     the unlawful practices perpetrated by Gerdau and its executive officers subjected the Company to numerous known, but undisclosed, risks, including monetary risk, reputational risk, risks associated with retention and/or renewal existing contracts, risks associated with the Company's international expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities and even a compulsory dissolution of Gerdau as a legal entity;

(e)     the unlawful practices perpetrated by defendants were in direct violation of the Company's Code of Ethics, which defendants represented guided their operations and by which executives of the Company were bound;

(f)     Gerdau's disclosure controls and procedures were either inadequately designed and insufficient to ensure that improper payments to tax authorities to waive or reduce Gerdau's tax liabilities was made known to defendants, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that André Gerdau, Dias, Luz, Scardoelli and Gasparetto were unaware of such improper payments, but they failed to disclose these material facts;

(g)     Gerdau's financial statements had not been prepared in conformity with IFRS (*see* ¶¶298-327) and, *inter alia*, materially understated the Company's tax liabilities and materially overstated the Company's net income;

(h)     the unlawful practices perpetrated by Gerdau and its executive officers were reasonably likely to have a material adverse effect on the Company's future operating results; and

(i)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about Gerdau's then-current business and future financial prospects.

## C.     False Statements in 2014

### 1.     4Q13 Quarterly Results

144.     On February 21, 2014, Gerdau issued a press release purporting to report its quarterly results for the fourth quarter of 2013 (the "4Q13 Press Release").  The Company reported R$492 million in net income for the quarter.

145.     According to the 4Q13 Press Release, the consolidated financial statements contained therein were prepared in accordance with IFRS.

146.     The same day, February 21, 2014, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the press release.

147.     On February 24, 2014, a copy of the press release was filed with the SEC on Form 6-K, signed by Dias.

### 2.     2013 Management Report

148.     Also on February 24, 2014, Gerdau filed its "Management Report" reporting on the Company's financial results and operations for the year ended December 31, 2013 on Form 6-K (the "2013 Management Report").  The Company reported net income of R$1.7 billion for the fiscal year.

- 42 -

149.    The Company represented that its Consolidated Financial Statements were "presented in accordance with the IFRS issued by the International Accounting Standards Board (IASB)."

150.    The Management Report represented that:

> **Gerdau complies with international corporate governance standards** and adopts the most modern management instruments in all of its operations.  This is reflected in its day-to-day activities by its capacity to create differentiated levels of profitability while **upholding the principles of transparency and respect for its stakeholders**, which include clients, suppliers, shareholders, employees and local communities.

151.    The 2013 Management Report was signed by Dias.

### 3.    **2013 Form 20-F**

152.    On March 24, 2014, Gerdau filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2013 (the "2013 Form 20-F").  Defendants reported net income of R$1.6 billion.  Gross profit was R$5 billion and diluted EPS on common shares was R$0.93.

153.    According to the 2013 Form 20-F, the Company prepared the consolidated financial statements presented therein "in accordance with IFRS as issued by the International Accounting Standards Board (IASB)."

154.    In the 2013 Form 20-F, the Company repeated its "commitment" to providing investors with a "fast and efficient flow of data" and "strengthening the stock markets."

155.    The Company again advised investors of its ongoing legal proceedings and their potential impact on Gerdau's financial results in the 2013 Form 20-F, stating that:

> Legal Proceedings
>
> \*        \*        \*
>
> Like other Brazilian companies, Gerdau and its subsidiaries are party to proceedings with respect to tax, labor and civil matters, most of them arising in the regular course of business.  **Based on advice from legal counsel, management believes that the reserve for provisions is sufficient to meet probable and**

- 43 -

*reasonably estimable losses in the event of unfavorable rulings, and that the ultimate resolution will not have a significant effect on its consolidated financial position* of December 31, 2013.

156.    Gerdau again described its ongoing goodwill tax dispute, but stated that losses arising from this matter were "not probable" and therefore no provision had been made for an adverse ruling.  The Company also stated:

> The Company's subsidiaries, Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A., Gerdau Comercial de Aços S.A. and Gerdau Açominas S.A., have administratively challenged the disallowance of the deductibility of a premium generated through a corporate reorganization in 2005, in accordance with articles 7 and 8 of Law no. 9532/97.  The premium was deducted from the tax bases of the income tax and social contribution on profits in the 2005-2010 period.  The total updated amount under discussion is R$3,408 million.  *No reserve for contingency was established, since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible*.

157.    The Company again stated that the probability for loss associated with this tax dispute was merely "possible" in the notes to the financial statements contained in the 2012 Form 20-F.

158.    The Company's by-laws, appended to the 2013 Form 20-F, charged the Board of Directors with "manag[ing the Company] with *zeal for ethical integrity, values and for the attendance of the laws and regulating norms which the Company is submitted*."

159.    The Company further assured investors that there had been no changes in its internal controls over Financial Reporting during the 2013 fiscal year that "*have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*."

160.    The Company also stated that:

> *In addition, there have been no significant changes in the Company's internal controls or in other factors that could significantly affect these controls subsequent to the date of their most recent evaluation*.

- 44 -

161.    In the 2013 Form 20-F, the Company described its disclosure controls procedures in a manner identical to that described in ¶62.  At the time of this filing, the Disclosure Committee members were: André Gerdau, Dias, Luz, Scardoelli and Gasparetto.

162.    The 2013 Form 20-F reiterated that all of Gerdau's business units were subject to its Code of Ethics, and that the "provisions of the Code are . . . binding on Gerdau's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Compliance Officer and other persons performing similar functions."  As described in ¶65, the Code of Ethics expressly prohibited improper relationships with, and payments to, government officials*.*  According to the 2013 Form 20-F, "[t]he Code of Ethics [was] *focused on the ethics and compliance issues most important to a publicly-held company*."

163.    The 2013 Form 20-F was signed by André Gerdau and Dias.

164.    André Gerdau and Dias certified the 2013 Form 20-F pursuant to Sarbanes-Oxley, stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

165.    André Gerdau and Dias further certified the 2013 Form 20-F in a manner identical to that described at ¶68.

### 4.    **1Q14 Quarterly Results**

166.    On May 7, 2014, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended March 31, 2014 (the "1Q14 Form 6-K").  The Company reported R$440 million in net income for the quarter.

167.    Defendants stated in the 1Q14 Form 6-K that the condensed consolidated interim financial statements contained therein were prepared in accordance with IFRS.

- 45 -

168.     The Company indicated that it had made a provision of R$1.124 billion for contingent tax liabilities.  Defendants once again reassured investors that this provision was "***sufficient to cover probable and reasonably estimable losses from unfavorable court decisions***" and further that "***the final decisions will not have significant effects on the financial position and operational results of the Company*** and its subsidiaries."

169.     The 1Q14 Form 6-K was signed by Dias.

170.     The same day, May 7, 2014, the Company issued a press release, repeating the quarterly financial results stated in the 1Q14 Form 6-K.  A copy of the press release was filed with the SEC on Form 6-K, signed by Dias.

171.     Also on May 7, 2014, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the press release and the 1Q14 Form 6-K.

5.     **2013 Annual Report**

172.     Also in the May 7, 2014 press release, Gerdau announced that its Annual Report for 2013 ("2013 Annual Report") was available on its website.

173.     In the 2013 Annual Report, defendants credited their "century-old values" with their "ability to build new business opportunities and at the same time generate outstanding profitability:"

> ***Transparency and respect for all stakeholders characterize Gerdau's operations***
>
> ***Gerdau has a sound governance structure whose conduct follows the Company's century-old values***.  In daily corporate practices, this is reflected in the ability to build new business opportunities and at the same time generate outstanding profitability, ***following the principles of transparency and respect for all stakeholders*** – customers, suppliers, shareholders, employees, and communities.

174.     In the 2013 Annual Report, defendants also informed investors that Gerdau had "a clear compliance system" to ensure compliance with the law wherever Gerdau operated:

- 46 -

> ***Gerdau has a clear compliance system that makes sure the current legislation is followed in all the countries where the Company operates***.  This system also detects and deals with any possible deviation or inconformity that might occur in relation to the Company's internal policies.

175.    Defendants further assured investors in the 2013 Annual Report that the Company "follow[ed] principles of transparency:"

> With over 65 years of experience in capital markets, ***Gerdau follows principles of transparency, agility and quality when disclosing information***, which contributes to building a close and long-term relationship with its more than 120,000 shareholders worldwide.

176.    The 2013 Annual Report also reported the Company's financial results for the year, as summarized from the 2013 Form 20-F.

### 6.    2Q14 Quarterly Results

177.    On July 30, 2014, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended June 30, 2014 (the "2Q14 Form 6-K").  The Company reported R$393 million in net income for the quarter.

178.    The Company indicated that it had made a provision of R$1.194 billion for contingent tax liabilities, again stating that this provision was "***sufficient to cover probable and reasonably estimable losses from unfavorable court decisions***."  The Company reiterated that any final decision would not materially affect the Company's financial results.

179.    Defendants stated in the 2Q14 Form 6-K that the condensed consolidated interim financial statements contained therein were prepared in accordance with IFRS.

180.    The 2Q14 Form 6-K was signed by Dias.

181.    The same day, July 30, 2014, the Company issued a press release, repeating the quarterly financial results stated in the 2Q14 Form 6-K.  A copy of the press release was filed with the SEC on Form 6-K, also signed by Dias.

- 47 -

182.    Also on July 30, 2014, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the press release and the 2Q14 Form 6-K.

7.    **3Q14 Quarterly Results**

183.    On November 5, 2014, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended September 30, 2014 (the "3Q14 Form 6-K").  The Company reported R$261.9 million net income for the quarter.

184.    Defendants stated in the 3Q14 Form 6-K that the condensed consolidated interim financial statements contained therein were prepared in accordance with IFRS.

185.    The Company indicated that it had made a provision of R$1.239 billion for contingent tax liabilities, again reassuring investors that the provision was "***sufficient to cover probable and reasonably estimable losses from unfavorable court decisions***."

186.    The 3Q14 Form 6-K was signed by Dias.

187.    The Company issued a press release the same day, November 5, 2014, repeating the quarterly financial results.  A copy of the press release was filed with the SEC on Form 6-K, signed by Dias.

188.    Also on November 5, 2014, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the press release and the 3Q14 Form 6-K.

**Reasons Why Statements in ¶¶144-188 Were Knowingly False and Misleading**

189.    The press releases, public statements and financial reports described above, and the representations about Gerdau's risk factors, business developments, governmental policies, income tax related obligations and expenses, financial statements, compliance with the law, sound corporate

- 48 -

governance, and disclosure and internal controls contained therein, were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

(a)     contrary to statements that the Company operated under "strict ethical principles," Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to illegally evade income taxes by bribing officials of CARF and engaging in other crimes to secure tax rulings in Gerdau's favor;

(b)     contrary to statements that the Company was committed to maintaining "a relationship of transparency" with investors, Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to conceal the true nature of the corporate restructuring transactions from 2005, in which Gerdau borrowed money from Itaú BBA, secured by equity in the Company's subsidiaries and a put option requiring the parent company controlled by the Gerdau family, Indac, to repurchase the equity.  Those corporate restructuring transactions were used to create the bogus goodwill deductions at issue in the tax bribery scheme;

(c)     Gerdau was then the subject of an ongoing dispute with Brazil's tax authorities over its improper accounting for goodwill related to the 2005 corporate restructuring, which the DRJ had already determined to be improper; but for Gerdau's bribes, an adverse ruling from CARF on this dispute was more than "merely possible," but indeed was likely, and the reserves for contingent tax liabilities were woefully inadequate to cover the unpaid taxes, penalties and fines of over R$3 billion;

(d)     the unlawful practices perpetrated by Gerdau and its executive officers subjected the Company to numerous known, but undisclosed, risks, including monetary risk,

- 49 -

reputational risk, risks associated with retention and/or renewal existing contracts, risks associated with the Company's international expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities and even a compulsory dissolution of Gerdau as a legal entity;

(e)     the unlawful practices perpetrated by defendants were in direct violation of the Company's Code of Ethics, which defendants represented guided their operations and by which executives of the Company were bound;

(f)     Gerdau's disclosure controls and procedures were either inadequately designed and insufficient to ensure that improper payments to tax authorities to waive or reduce Gerdau's tax liabilities was made known to defendants, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that André Gerdau, Dias, Luz, Scardoelli and Gasparetto were unaware of such improper payments, but they failed to disclose these material facts;

(g)     Gerdau's financial statements had not been prepared in conformity with IFRS (*see* ¶¶298-327) and, *inter alia*, materially understated the Company's tax liabilities and materially overstated the Company's net income;

(h)     the unlawful practices perpetrated by Gerdau and its executive officers were reasonably likely to have a material adverse effect on the Company's future operating results; and

(i)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about Gerdau's then-current business and future financial prospects.

- 50 -

D.     **False Statements in 2015**

1.     **4Q14 Quarterly Results**

190.    On March 4, 2015, Gerdau issued a press release, purporting to report its quarterly financial results for the fourth quarter of 2014 (the "4Q14 Press Release").  The Company reported R$393 million net income for the quarter.

191.    Defendants represented in the 4Q14 Press Release that the Company's Consolidated Financial Statements were presented in accordance with IFRS.

192.    In the 4Q14 Press Release, the Company also presented its "Management Report" for the 2014 Fiscal Year (the "2014 Management Report").  The 2014 Management Report reflected R$1.5 billion net income for the fiscal year.

193.    The 2014 Management Report lauded the Company's "*[t]ransparency and equitable treatment in investor relations*," and stated that "Gerdau has a *solid corporate governance structure* supported by values that stretch back over one hundred years."

194.    Also on March 4, 2015, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the financial results as presented in the press release and the Management Report.

195.    On March 6, 2015, copies of both the 4Q14 Press Release and the 2014 Management Report were filed with the SEC on Form 6-K, signed by Dias.

2.     **March 26, 2015 – Gerdau's Name Comes Up in Zelotes Investigation, but Defendants Deny Involvement**

196.    On March 26, 2015, Brazilian authorities announced that up to 70 companies, including Gerdau, were being investigated as part of Operation Zelotes.  On this news, the price of Gerdau stock declined 11.05% on huge volume.  Responding to these developments, Gerdau said that it had not been contacted by any public authority regarding Operation Zealots and stated: "***The***

- 51 -

***company reiterates that it has rigorous ethical standards in conducting its [legal proceedings] with***

***public agencies.***"

197.    On this news, the price of Gerdau ADRs declined 11.05% on heavy trading volume.

However, defendants' false and misleading denials of wrongdoing continued to maintain artificial

inflation in the ADR price.

### 3.    **2014 Form 20-F**

198.    On March 31, 2015, Gerdau filed its annual report of financial results on Form 20-F

with the SEC for the fiscal year ended December 31, 2014 (the "2014 Form 20-F").  Defendants

reported net income of R$1.4 billion.  Gross profit was R$5.1 billion and diluted EPS on common

shares was R$0.82.

199.    According to the 2014 Form 20-F, the financial results presented therein were "based

on the Company's consolidated financial statements prepared in accordance with IFRS."

200.    In the 2014 Form 20-F, the Company repeated its "commitment" to providing

investors with a "fast and efficient flow of data" and "strengthening the stock markets."

201.    The Company again advised investors of its ongoing legal proceedings and their

potential impact on Gerdau's financial results in the 2014 Form 20-F.  The Company represented

that it had made "***sufficient***" reserve provisions to cover any "***unfavorable rulings***."  It further

represented that the "ultimate resolution" of any ongoing matters would not materially affect the

Company's financial position.

202.    The Company again identified its ongoing goodwill tax dispute:

> The Company's subsidiaries, Gerdau Aços Longos S.A., Gerdau Aços
> Especiais S.A., Gerdau Comercial de Aços S.A. and Gerdau Açominas S.A., have
> administratively challenged the disallowance of the deductibility of a premium
> generated through a corporate reorganization in 2005, in accordance with articles 7
> and 8 of Law no. 9532/97.  The premium was deducted from the tax bases of the
> income tax and social contribution on profits in the 2005-2010 period.  The total

- 52 -

updated amount under discussion is R$3,225 million.  *No reserve for contingency was established, since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible*.

203.     As before, Gerdau stated that the probability for loss associated with the goodwill tax dispute was merely "possible" in the notes to the financial statements contained in the 2014 Form 20-F.

204.     In the 2014 Form 20-F, the Company described its disclosure controls and procedures in a manner identical to that described in ¶62.  For 2014, the Disclosure Committee members were: André Gerdau, Dias, Luz, Scardoelli and Gasparetto.

205.     The 2014 Form 20-F reiterated that all of Gerdau's business units were subject to its Code of Ethics, and that the "*provisions of the Code are . . . binding on Gerdau's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Compliance Officer and other persons performing similar functions*."   As described in ¶65, the Code of Ethics expressly prohibited improper relationships with, and payments to, government officials*.*  According to the 2014 Form 20-F, "[t]he Code of Ethics [was] *focused on the ethics and compliance issues most important to a publicly-held company*."

206.     The 2014 Form 20-F was signed by André Gerdau and Dias.

207.     The 2014 Form 20-F was certified, pursuant to Sarbanes-Oxley, by André Gerdau and Dias, who each certified that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

208.     André Gerdau and Dias further certified the 2014 Form 20-F in a manner identical to that described at ¶68.

- 53 -

4.      **1Q15 Quarterly Results**

209.    On May 6, 2015, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended March 31, 2015 (the "1Q15 Form 6-K").  The Company reported net income of R$267.3 million for the quarter.

210.    Defendants represented in the 1Q15 Form 6-K that the Company's consolidated financial statements were prepared in accordance with IFRS.

211.    Gerdau again represented that its reserve provisions for contingent tax liability was "***sufficient to cover probable and reasonably estimable losses from unfavorable court decisions***."

212.    The Company identified the goodwill tax dispute as a "contingent liabilit[y] for which provisions were not recorded":

> The subsidiaries Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A. and Gerdau Açominas S.A., discuss, administratively, the disallowance of the deductibility for income tax and social contribution purposes of goodwill related to the reorganization carried out in 2004/2005, pursuant to article 7 and 8 of Law 9532/97.  The total updated amount of the discussions is R$3,449,136.  ***No reserve for contingency was established, since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible***.

213.    Also in the 1Q15 Form 6-K, the Company stated that CVM, Brazil's equivalent of the SEC, had contacted defendants regarding Operation Zelotes.  Defendants denied any involvement and stressed the Company's "strict ethical standards":

> On April 6, 2015, the Company received Official Letter n°134/2015/CVM/SEP/GEA-2 of the Brazilian Securities and Exchange Commission with request for clarification on news related to inquisition in the Tax administrative appeal board.  ***In response to the Letter, the Company clarifies that, up to this date, has not been contacted by any public authority about the operation Zelotes.  The Company also reiterates that have strict ethical standards in conducting their pleas with public agencies***.

214.    The 1Q15 Form 6-K was signed by Dias.

215.     Also on May 6, 2015, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Dias repeated the quarterly financial results as presented in the 1Q15 Form 6-K.

216.     On May 7, 2015, the Company issued a press release, repeating the quarterly financial results stated in the 1Q15 Form 6-K.  A copy of the press release was submitted on Form 6-K on the same day, signed by Dias.

5.     **2014 Annual Report**

217.     Also on May 7, 2015, the Company announced that its Annual Report for fiscal year 2014 (the "2014 Annual Report") was available on its website.

218.     In the 2014 Annual Report, defendants attributed the Company's "competitiveness" to its "century-old values":

> **Century-old values guide the search for greater efficiency and business competitiveness**
>
> Gerdau ***has a solid corporate governance structure based on its century-old values***.  In addition, it has modern management systems to achieve greater efficiency and competitiveness of its operations.

219.     Defendants also assured investors of Gerdau's compliance with Sarbanes-Oxley and the quality of the Company's financial statements:

> Because it operates in the capital markets of the United States, ***Gerdau follows the standards set by the Sarbanes-Oxley Act (SOX), which establishes good corporate governance practices and controls over its internal processes***.

220.     The 2014 Annual Report also reported the Company's financial results for the year, as summarized from the 2014 Form 20-F.

- 55 -

6. **July 14, 2015 – Gerdau Discloses Questionable Plan to Purchase Minority Interest in Controlled Companies; CFO Resigns Next Day**

221. On July 14, 2015, as federal police continued to investigate the tax fraud scheme at CARF, Gerdau shocked the market when it announced that it would spend in excess of R$1.98 billion to acquire minority interests in the Company's subsidiaries, in which it already owned over 95% of the controlling interests. *See* ¶¶25-26. In announcing the transaction, Gerdau stated that "These acquisitions of equity interests, in the aggregate amount of R$1,986 million, will enable Gerdau S.A. to hold more than 99% of the total capital of each of the subsidiaries . . . ."

222. News of this seemingly pointless use of corporate assets to purchase such a miniscule minority interest in its own subsidiaries of which the Company already owned in excess of 95%, caused the price of Gerdau securities to decline more than 7.49% on July 14, 2015 and to continue to decline thereafter as the news was absorbed by the market. This release, however, did not reveal the true nature of the self-dealing transaction from 2005 or the real reasons why Gerdau appeared to waste over R$1.98 billion on subsidiaries it already controlled.

223. The next day, July 15, 2015, Dias resigned as Gerdau's CFO.

7. **2Q15 Quarterly Results**

224. On August 13, 2015, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended June 30, 2015 (the "2Q15 Form 6-K"). The Company reported net income of R$264.4 million for the quarter.

225. In the 2Q15 Form 6-K, Gerdau represented that the Condensed Consolidated Interim Financial Statements presented therein, as well as Gerdau's Consolidated Financial Statements for the year ended December 31, 2014, were prepared in accordance with IFRS.

226.     The 2Q15 Form 6-K reflected an R$1.7 billion provision for contingent tax liabilities. The Company stated that that provision was sufficient to cover losses arising from "unfavorable court decisions."

227.     Among the contingent liabilities for which the Company did ***not*** record a provision was the goodwill tax dispute:

> The subsidiaries Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A. and Gerdau Açominas S.A., discuss, administratively, the disallowance of the deductibility for income tax and social contribution purposes of goodwill related to the reorganization carried out in 2004/2005, pursuant to article 7 and 8 of Law 9532/97. The total updated amount of the discussions is R$3,589,816. ***No reserve for contingency was established, since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible***.

228.     In the 2Q15 Form 6-K, Gerdau again referred to the letter received from CVM on April 6, 2015. The Company denied involvement in Operation Zelotes and reiterated its adherence to strict ethical standards:

> On April 6, 2015, the Company received Official Letter n° 134/2015/CVM/SEP/GEA-2 from the Brazilian Securities and Exchange Commission with request for clarification of a news item related to the investigation in the Tax Administrative Appeal Board and clarifies that, ***as of this date, it has not been contacted by any public authority about Operation Zelotes. The Company also reiterates that it maintains strict ethical standards in the conduct of its proceedings with public agencies***.

229.     The 2Q15 Form 6-K was signed by Scardoelli.

230.     In a press release dated the same day, August 13, 2015, Gerdau repeated the quarterly financial results contained in the consolidated financial statements filed on Form 6-K, and asserted that those financial statements were prepared in accordance with IFRS. A copy of the press release was filed with the SEC on Form 6-K, also signed by Scardoelli, on the same day.

231.    The Company hosted a conference call for investors and analysts on August 12, 2015, during which André Gerdau and Scardoelli discussed the same quarterly financial results as presented in the 2Q15 Form 6-K.

### 8.    3Q15 Quarterly Results

232.    On October 29, 2015, Gerdau reported its quarterly financial results on Form 6-K for the quarter ended September 30, 2015 (the "3Q15 Form 6-K").  The Company reported net income at a loss of R$1.9 billion for the quarter.

233.    In the 3Q15 Form 6-K, Gerdau represented that the Condensed Consolidated Interim Financial Statements presented therein, as well as Gerdau's Consolidated Financial Statements for the year ended December 31, 2014, were prepared in accordance with IFRS.

234.    The 3Q15 Form 6-K reflected an R$1.81 billion provision for contingent tax liabilities, but again stated that its reserves were "sufficient" to cover losses from "unfavorable court decisions."

235.    The Company stated it had not made any provision for the goodwill tax dispute:

The subsidiaries Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A. and Gerdau Açominas S.A., discuss, administratively, the disallowance of the deductibility for income tax and social contribution purposes of goodwill related to the reorganization carried out in 2004/2005, pursuant to article 7 and 8 of Law 9532/97.  The total updated amount of the discussions is R$3,636,644.  ***No reserve for contingency was established, since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible***.

236.    The 3Q15 Form 6-K repeated the Company's earlier statement regarding Operation Zelotes, stating that "up to this date, has not been contacted by any public authority about the operation Zelotes.  ***The Company also reiterates that have [sic] strict ethical standards in conducting their pleas with public agencies***."

237.    The 3Q15 Form 6-K was signed by Scardoelli.

- 58 -

238.     Also on October 29, 2015, Gerdau hosted a conference call for investors and analysts, during which André Gerdau and Scardoelli repeated the quarterly financial results as presented in the 3Q15 Form 6-K.

**Reasons Why Statements in ¶¶190-238 Were Knowingly False and Misleading**

239.     The press releases, public statements and financial reports described above, and the representations about Gerdau's risk factors, business developments, governmental policies, income tax related obligations and expenses, financial statements, strict ethical standards, and disclosure and internal controls contained therein, were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

(a)     contrary to statements that the Company operated under "strict ethical principles," Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to illegally evade income taxes by bribing officials of CARF and engaging in other crimes to secure tax rulings in Gerdau's favor;

(b)     contrary to statements that the Company was committed to maintaining "a relationship of transparency" with investors, Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to conceal the true nature of the corporate restructuring transactions from 2005, in which Gerdau borrowed money from Itaú BBA, secured by equity in the Company's subsidiaries and a put option requiring the parent company controlled by the Gerdau family, Indac, to repurchase the equity.  Those corporate restructuring transactions were used to create the bogus goodwill deductions at issue in the tax bribery scheme;

- 59 -

(c)     Gerdau was then the subject of an ongoing dispute with Brazil's tax authorities over its improper accounting for goodwill related to the 2005 corporate restructuring, which the DRJ had already determined to be improper; but for Gerdau's bribes, an adverse ruling from CARF on this dispute was more than "merely possible," but indeed was likely, and the reserves for contingent tax liabilities were woefully inadequate to cover the unpaid taxes, penalties and fines of over R$3 billion;

(d)     the unlawful practices perpetrated by Gerdau and its executive officers subjected the Company to numerous known, but undisclosed, risks, including monetary risk, reputational risk, risks associated with retention and/or renewal existing contracts, risks associated with the Company's international expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities and even a compulsory dissolution of Gerdau as a legal entity;

(e)     the April 6, 2015 letter from CVM placed defendants on notice of the Company's possible implication in Operation Zelotes;

(f)     the unlawful practices perpetrated by defendants were in direct violation of the Company's Code of Ethics, which defendants represented guided their operations and by which executives of the Company were bound;

(g)     Gerdau's disclosure controls and procedures were either inadequately designed and insufficient to ensure that improper payments to tax authorities to waive or reduce Gerdau's tax liabilities was made known to defendants, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that André Gerdau, Dias[4], Luz, Scardoelli

---

[4]     Dias resigned on July 15, 2015.

and Gasparetto were unaware of such improper payments, but they failed to disclose these material facts;

(h)     Gerdau's financial statements had not been prepared in conformity with IFRS (*see* ¶¶298-327) and, *inter alia*, materially understated the Company's tax liabilities and materially overstated the Company's net income;

(i)     the unlawful practices perpetrated by Gerdau and its executive officers were reasonably likely to have a material adverse effect on the Company's future operating results; and

(j)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about Gerdau's then-current business and future financial prospects.

## VI.     THE TRUTH BEGINS TO EMERGE, BUT DEFENDANTS DENY WRONGDOING

### A.     December 4, 2015 – Gerdau Named as a Beneficiary of Tax Evasion Scheme

240.     On December 4, 2015, a Brazilian publication reported that Gerdau, along with other companies, had been named in a government report as a beneficiary of a tax evasion scheme under investigation.  On this news, the price of Gerdau ADRs fell $0.11, or 6.96%, to close at $1.47 per ADR on December 4, 2015.

### B.     Gerdau's Continued False Statements

#### 1.     February 25, 2016 – First "Notice to the Market"

241.     On February 25, 2016, in connection with the ongoing Operation Zelotes investigation, federal police in Brazil stormed Gerdau's offices in São Paulo, Brasília, Rio de Janeiro, Recife, and the company's headquarters in Porto Alegre.  Investigators seized documents and took statements from André Gerdau and 21 other individuals.

- 61 -

242.    The same day, Gerdau released a statement to investors, which was posted on its website, regarding the police raid, denying any wrongdoing and "reiterat[ing]" its "strict ethical standards":

NOTICE TO THE MARKET

Gerdau hereby announces that the Brazilian Federal Police is in its offices this morning in connection with Operation Zelotes.  It clarifies that it has no further information at the moment, but is fully cooperating with the Federal Police investigations.

It also emphasizes that, *based on its ethical principles, Gerdau did not provide any authorization for its name to be used in alleged unlawful negotiations, and strongly repudiates any action taken for this purpose*.

*Gerdau reiterates that it has set strict ethical standards for its dealings with public agencies* and reaffirms that it is, as it has always been, at the disposal of competent authorities to provide any clarifications that may be requested.

243.    The Notice to the Market was signed by Scardoelli.

244.    A copy of the Notice to the Market was filed with the SEC on February 25, 2016, on Form 6-K, also signed by Scardoelli.

## 2.    **February 25, 2016 – Second "Notice to the Market"**

245.    Later the same day, February 25, 2016, Gerdau issued yet another "Notice to the Market," continuing to deny that it had participated in any fraudulent scheme of tax evasion:

NOTICE TO THE MARKET

Given that the name of Gerdau has been mentioned in Operation Zelotes, the company hereby clarifies and reiterates the following to the public:

- Gerdau has pending proceedings filed with the Administrative Council of Tax Appeals (CARF) and has always used the services of external firms strictly to obtain the best technical advice.

- *Contrary to media reports, this is not a question of tax evasion - false tax statement or omission to skirt eventual taxes due —but a question of the legitimate use of the right of Gerdau companies, expressly backed by law and precedents*.

- 62 -

- The financial information related to ongoing proceedings at CARF have been disclosed in the notes to the Company's Financial Statements.

- All agreements with these external firms, as with other agreements that Gerdau has entered into with service providers, have included a clause that determines absolute compliance with laws, breach of which calls for immediate termination thereof.

- ***No money was paid or passed on to external firms in the specific case and agreements were rescinded when the names of service providers investigated were reported in the press for suspected illegal activities***.

- ***The company never gave any authorization for its name to be used in alleged unlawful negotiations and strongly repudiates any action taken for this purpose***.

***Thus, Gerdau, as a company that has been in the market for 115 years, reiterates that it has set strict ethical standards for its dealings with public agencies*** and reaffirms that it is, as it has always been, at the disposal of competent authorities to provide any clarifications that may be requested.

246.   The Notice to the Market was signed by Scardoelli.

247.   A copy of the Notice to the Market was filed with the SEC on February 26, 2016, on Form 6-K, also signed by Scardoelli.

248.   On news of Gerdau's possible involvement in tax fraud, the price of Gerdau ADRs declined from a closing price of $0.95 on February 24, 2016, to a closing price of $0.87 on February 26, 2016.  However, due to defendants' knowingly false denials of wrongdoing, the ADRs continued to trade at artificially inflated levels.

### 3.   February 29, 2016 – Gerdau Delays Earnings Announcement

249.   On February 29, 2016, the Company announced it would postpone the release of its earnings release from March 1, 2016 to March 15, 2016.  According to the announcement, "[t]he postponing [was] important to enable the Company to analyze the case records involving Gerdau in the recent phase of Zelotes Operation."

- 63 -

4.    **4Q15 Quarterly Results and Management Report**

250.    On March 15, 2016, Gerdau issued a press release regarding its financial results for the fourth quarter of 2015, and its Management's Report of financial results for the year ended December 31, 2016 (the "4Q15 Press Release").  Gerdau reported net income at a loss of R$41 million for the quarter and a loss of R$4.6 billion for the year.

251.    In the 4Q15 Press Release, the Company stated that the Consolidated Financial Statements contained therein were prepared in compliance with IFRS.

252.    Gerdau continued to proclaim that it "***adopt[ed] international standards of corporate governance grounded in rigorous ethical principles***," and stated that the Company "works to build and maintain transparent and close relationships with all of its stakeholders, including . . . shareholders."

253.    The 4Q15 Press Release reiterated the previously released statement concerning Operation Zelotes:

CLARIFICATION ABOUT ZELOTES OPERATION

Given that the name of Gerdau has been mentioned in Operation Zelotes, the company hereby clarifies and reiterates the following to the public:

- Gerdau has pending proceedings filed with the Administrative Council of Tax Appeals (CARF) and has always used the services of external firms strictly to obtain the best technical advice.

- ***Contrary to media reports, this is not a question of tax evasion - false tax statement or omission to skirt eventual taxes due — but a question of the legitimate use of the right of Gerdau companies, expressly backed by law and precedents***.

- The financial information related to ongoing proceedings at CARF have been disclosed in the notes to the Company's Financial Statements.

- All agreements with these external firms, as with other agreements that Gerdau has entered into with service providers, have included a clause that determines absolute compliance with laws, breach of which calls for immediate termination thereof.

- ***No money was paid or passed on to external firms in the specific case and agreements were rescinded when the names of service providers investigated were reported in the press for suspected illegal activities.***

- ***The company never gave any authorization for its name to be used in alleged unlawful negotiations and strongly repudiates any action taken for this purpose.***

    ***Thus, Gerdau, as a company that has been in the market for 115 years, reiterates that it has set strict ethical standards for its dealings with public agencies*** and reaffirms that it is, as it has always been, at the disposal of competent authorities to provide any clarifications that may be requested.

254.    A copy of the 4Q15 Press Release was filed with the SEC on Form 6-K on March 16, 2016, signed by Scardoelli.

255.    Also on March 15, 2016, Gerdau hosted a conference call for investors and analysts to discuss the Company's quarterly financial results.  During the conference call, André Gerdau and Scardoelli repeated the financial results as presented in the 4Q15 Press Release.

256.    Also during the call, André Gerdau continued to deny that Gerdau had engaged in any improper relationships with tax authorities:

    Firstly, I would like to say that we postponed our earnings release conference call of March 1 to today in order to analyze the case records involving Gerdau and the Zelotes operation.  To reinstate our position on this topic, we reached the official communicate that many of you already received.

    First of all, Gerdau has pending proceedings filed with the Administrative Council of Tax Appeals (CARF) and has always used the services of external firms strictly to obtain the best possible technical advice.  ***Contrary to media reports, this is not a matter of tax evasion, false tax statement or omission to skirt eventual taxes due, but it is a question of legitimate use of the right of Gerdau companies, expressed by laws and precedents.***  The financial information related to ongoing proceedings at CARF have been disclosed in the explanatory notes of the Company's Financial Statements.

    All agreements with these external firms and also other contract and agreements with service vendors that Gerdau has entered into with service providers, included a clause that determines absolute compliance with laws, breach of which calls for immediate termination thereof.  ***No money was paid or passed on to external firms in the specific case and agreements were rescinded when the names of service providers investigated were reported in the press for suspected illegal***

- 65 -

***activities.  The Company never gave any authorization for its name to be used in alleged unlawful negotiations and strongly repudiates any action taken for this purpose***.  Thus, Gerdau, as a company that has been in the market for 115 years, reiterates that ***it has set strict ethical standards for its dealings with public agencies*** and reaffirms that it is, as it has always been, at the disposal of competent authorities to provide any clarifications that may be requested.

5.      **2015 Form 20-F**

257.    On March 31, 2016, Gerdau filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2015 (the "2015 Form 20-F").  Defendants reported net income at a loss of R\$4.6 billion.  Gross profit was R\$4.29 billion and diluted EPS on common shares was a loss of R\$2.69.

258.    The 2015 Form 20-F represented that the Company's Consolidated Financial Statements were prepared in compliance with IFRS.

259.    In the 2015 Form 20-F, the Company repeated its "commitment" to providing investors with a "fast and efficient flow of data" and "strengthening the stock markets."

260.    The Company again advised investors of its ongoing legal proceedings and their potential impact on Gerdau's financial results in the 2015 Form 20-F, as follows:

Legal Proceedings

\*        \*        \*

Like other Brazilian companies, Gerdau and its subsidiaries are party to proceedings with respect to tax, labor and civil matters, most of them arising in the regular course of business.  ***Based on advice from legal counsel, management believes that the reserve for provisions is sufficient to meet probable and reasonably estimable losses in the event of unfavorable rulings, and that the ultimate resolution will not have a significant effect on its consolidated financial position*** of December 31, 2015.

261.    The Company identified the goodwill tax dispute as one for which no provision had been made, stating:

***Considering the opinion of our legal advisors and the assessment by management, the likelihood of loss in connection with the lawsuits and***

- 66 -

*proceedings listed below is deemed possible (but not likely), and, according to the accounting principles currently in force, no accounting reserves were made in connection with said proceedings*.

*        *        *

Subsidiaries Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A. and Gerdau Açominas S.A., are parties to administrative proceedings relating to the disallowance of the deductibility of goodwill generated in accordance with Article 7 and 8 of Law 9,532/97 – as a result of a corporate restructuring carried out in 2004/2005 – from the tax base of the Corporate Income tax – IRPJ and Social Contribution on Net Income – CSLL. The total updated amount of the proceedings is R$3,666 million, of which (i) R$1,263 million correspond to three proceedings involving subsidiaries Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A. and Gerdau Açominas S.A., whose voluntary appeals were granted in 2012 and are subject to appeals filed by the Special Prosecutor of the National Treasury, currently pending in CARF's higher court; (ii) R$1,882 million correspond to a proceeding involving Gerdau Aços Longos S.A., whose voluntary appeal was dismissed by CARF's lower court in 2014 and is subject to a special appeal currently pending in CARF's higher court; (iii) R$421 million correspond to two proceedings involving Gerdau Aços Longos S.A., whose voluntary appeal is currently pending in CARF's lower court; (iv) R$100 million correspond to a proceeding involving Gerdau Aços Especiais S.A., the decision of which is currently pending in the Federal Revenue Service Bureau.

262.    The Company acknowledged that the goodwill tax dispute was encompassed by Operation Zelotes, but nevertheless repeated that the probability for loss associated with this tax dispute was "***not likely***" in the 2015 Form 20-F:

> *Decisions handed down to date in the proceedings relating to profits generated abroad and the deductibility of goodwill, as above mentioned, are being investigated in the context of "Operação Zelotes"*, as mentioned in Note 17 and Note 31.
>
> *The Company's legal advisors confirm that the procedures adopted by the Company with respect to the tax treatment of profits abroad and the deductibility of goodwill were strictly legal, and, therefore, the likelihood of loss with respect to said proceedings is possible (but not likely)*.

263.    The 2015 Form 20-F further elaborated on Operation Zelotes, disclosing for the first time that Gerdau had initiated an internal investigation to determine whether there was any evidence of fraudulent conduct:

> III)  Operation Zelotes

- 67 -

As described in Note 17, certain subsidiaries of Gerdau S.A. (collectively, "Company") are parties to ongoing proceedings before the Administrative Board of Tax Appeals ("CARF"), an administrative organ of the Brazilian Ministry of Finance.

*      *      *

Considering the involvement of Gerdau's name in press reports concerning the Operation [Zelotes], *the Board of Directors decided to engage outside counsel, which would report to a Special Committee of the Board, to conduct an investigation to determine, among other things*: (i) whether, in light of current knowledge, proper protocol was followed in the hiring of firms representing the Company in cases before CARF; (ii) whether such firms have remained within the scope of their work/hiring; (iii) whether the engagement terms for such firms included clauses intended to prevent activity that violates ethical codes or laws currently in force; (iv) whether the engagement terms for such firms included the establishment of sanctions for any violations (whether contractual breaches or otherwise); and (v) *if there is any evidence of fraud, deceit, bad faith, or any expression of an intent to commit an illegal act on the part of a director or officer of the Company* in the negotiation, signing or carrying out of the aforementioned contracts ("Internal Investigation").

On February 25, 2016, the Federal Police came to Gerdau's premises to execute court ordered searches and seizures, taking documents and data for examination. The Federal Police also interviewed certain individuals associated with Gerdau, including its Chief Executive Officer and another current Board member. On that same date, filing a press release with SEC and CVM, the Company informed Bovespa and the New York Stock Exchange (NYSE).

The Internal Investigation is ongoing, and the Company is cooperating with the Federal Police.

264.    Also in the 2015 Form 20-F, the Company identified the following risk factor for the

first time:

*Unfavorable outcomes in judicial, administrative and regulatory litigation may negatively affect our results of operations, cash flows and financial condition*.

265.    Describing the goodwill tax dispute, the Company went on to state:

*Decisions handed down to date in the proceedings relating to profits generated abroad and the deductibility of goodwill, as above mentioned, are being investigated in the context of "Operação Zelotes"*, as mentioned in Note 17 and Note 31.

- 68 -

*The Company's legal advisors confirm that the procedures adopted by the Company with respect to the tax treatment of profits abroad and the deductibility of goodwill were strictly legal, and, therefore, the likelihood of loss with respect to said proceedings is possible (but not likely).*

*While most of the proceedings described here are presently proceeding at the administrative level, if a definitive unfavorable ruling were to be rendered in one or more of these proceedings and in other proceedings in which the Company and/or its subsidiaries are parties, the result could be an adverse effect on our financial condition.* For further discussion of these matters see "Legal Proceedings."

266. The 2015 Form 20-F also contained this risk disclosure for the first time:

*Our operations expose us to risks and challenges associated with conducting business in compliance with applicable anti-bribery anti-corruption and antitrust laws and regulations.*

*. . . In recent years there has been an increased focus on corruption in Brazil* and also the investigation and enforcement activities of the United States under the FCPA and by other governments under similar laws and regulations. *These laws generally prohibit corrupt payments to governmental officials and certain payments, gifts or remunerations to or from clients and suppliers.*

Violations of these laws and regulations could result in fines, criminal penalties and/or other sanctions against us, our officers or our employees, requirements to impose more stringent compliance programs, and prohibitions on the conduct of our business and our ability to participate in public biddings for contracts. We may incur expenses and recognize provisions and other charges in respect of such matters. *In addition, the increased attention focused upon liability issues as a result of investigations, lawsuits and regulatory proceedings could harm our brand or otherwise impact the growth of our business.*

\*     \*     \*

*Considering the involvement of Gerdau's name in press reports concerning the Operation [Zelotes], the Board of Directors decided to engage outside counsel, which would report to a Special Committee of the Board, to conduct an investigation.*

*On February 25, 2016, the Federal Police came to Gerdau's premises to execute court ordered searches and seizures, taking documents and data for examination. The Federal Police also interviewed certain individuals associated with Gerdau, including its Chief Executive Officer and another current Board member.* On that same date, filing a press release with SEC and CVM, the Company informed Bovespa and the New York Stock Exchange (NYSE).*The internal*

- 69 -

*investigation is ongoing, and the Company is cooperating with the Federal Police*. . . .

*Although the Company does not presently believe that these matters will have a material adverse effect on its business, given the inherent uncertainties in such situations, the Company can provide no assurance that these matters will not be material to its business in the future*.

267.     In the 2015 Form 20-F, the Company described its disclosure controls and procedures in a manner identical to that described in ¶62.  For 2015, the Disclosure Committee members were: André Gerdau, Scardoelli, Gasparetto, André Areno and Clemir Uhlein.

268.     Despite the ongoing internal and police-led investigations concerning potential improper payments to tax authorities, the 2015 Form 20-F stated that:

*There have been no changes in our internal controls over Financial Reporting during the fiscal year 2015, which have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*.

*In addition, there have been no significant changes in the Company's internal controls or in other factors that could significantly affect these controls subsequent to the date of their most recent evaluation*.

269.     The 2015 Form 20-F reiterated that all of Gerdau's business units were subject to its Code of Ethics, and that the "*provisions of the Code are . . . binding on Gerdau's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Compliance Officer and other persons performing similar functions*."   As described in ¶65, the Code of Ethics expressly prohibited improper relationships with, and payments to, government officials.  According to the 2015 Form 20-F, "[t]he Code of Ethics [was]*focused on the ethics and compliance issues most important to a publicly-held company*."

270.     The 2015 Form 20-F was signed by André Gerdau and Scardoelli.

271.     André Gerdau and Scardoelli certified the 2015 Form 20-F pursuant to Sarbanes-Oxley, stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

- 70 -

272.    André Gerdau and Scardoelli further certified the 2015 Form 20-F in a manner identical to that described at ¶68.

6.    **April 18, 2016 – Amidst Rumors of Zelotes Involvement, Gerdau Discloses Stunning Details of Questionable Dealings with Bank Itaú**

273.    On April 18, 2016, due to concerns raised by the Company's minority shareholders and Brazilian securities regulators, Gerdau released a revised Management Report in anticipation of the annual shareholders' meeting.  In that report, Gerdau revealed for the first time details of its plan to purchase minority positions in the Company's subsidiaries.

274.    From the revised report, investors learned that the transaction involved purchases of shares from Itaú BBA, as well as from its competitor, Arcelor.  The terms of the transaction were very questionable, especially the fact that Gerdau was paying Itaú three to four times the price it was paying Arcelor for the same shares in the transaction.  *See* ¶¶33-35.

275.    Investors also learned the true reason for the transaction: that the repurchase of the shares from Itaú BBA was required because the bank had an option with Gerdau's parent company, Indac, also controlled by the Gerdau family.  The revised Management Report stated:

> As already reported by the Company to the CVM, Itaú had an option with Indac - Indústria, Administração e Comércio S.A. ("Indac"), the controlling company of Metalúrgica Gerdau S.A. ("Metalúrgica Gerdau") to sell stakes for a certain price. Metalúrgica Gerdau was the guarantor for Indac in that option.  Gerdau was not tied to those contracts, and went through with the operation believing it was in the interest of the Company.

276.    On April 18, 2016, in response to this stunning disclosure, which for the first time informed investors that Gerdau paid over R$1.98 billion for an option obligation of the parent company Indac to purchase the equity of subsidiaries of which it already owned 95% at prices 3-4 times what another company received for the stock in the same transaction, the price of Gerdau stock declined 7.24% on very heavy volume.

- 71 -

7.      **1Q16 Quarterly Results**

277.    On May 4, 2016, Gerdau filed its quarterly results on Form 6-K for the quarter ended March 31, 2016 (the "1Q16 Form 6-K").  The Company reported R\$14 million in net income for the quarter.

278.    In the 1Q16 Form 6-K, Gerdau represented that the Condensed Consolidated Interim Financial Statements presented therein, as well as Gerdau's Consolidated Financial Statements for the year ended December 31, 2015, were prepared in accordance with IFRS.

279.    The 1Q16 Form 6-K reflected an R\$1.9 billion provision for contingent tax liabilities. Despite their ongoing internal investigation into potential fraud and tax evasion, the Company nevertheless stated that these reserve provisions were "***sufficient to cover . . . losses from unfavorable court decisions***," and that any final decisions would not materially impact the Company's financial position.

280.    The goodwill tax dispute was among the contingent liabilities for which the Company did ***not*** record a provision:

> Subsidiaries Gerdau Aços Longos S.A., Gerdau Aços Especiais S.A. and Gerdau Açominas S.A., are parties to administrative proceedings relating to the disallowance of the deductibility of goodwill generated in accordance with Article 7 and 8 of Law 9,532/97 – as a result of a corporate restructuring carried out in 2004/2005 – from the tax base of the Corporate Income tax – IRPJ and Social Contribution on Net Income – CSLL. The total updated amount of the proceedings is R\$3,712,631, of which (i) R\$1,278,643 correspond to three proceedings involving subsidiaries Gerdau Acos Longos S.A., Gerdau Aços Especiais S.A. and Gerdau Açominas S.A., whose voluntary appeals were granted in 2012 and are subject to special appeals filed by the Prosecutor of the National Treasury, currently pending in CARF's higher court; (ii) R\$1,905,894 correspond to a proceeding involving Gerdau Acos Longos S.A., whose voluntary appeal was dismissed by CARF's lower court in 2014 and is subject to a special appeal currently pending in CARF's higher court; (iii) R\$426,346 correspond to two proceedings involving Gerdau Aços Longos S.A., whose voluntary appeal is currently pending in CARF's lower court; (iv) R\$101,748 correspond to a proceeding involving Gerdau Aços Especiais S.A., the decision of which is currently pending in the Federal Revenue Service Bureau. ***No reserve for contingency was established,***

- 72 -

*since the Company believes, based on the opinion of its legal advisers, that the likelihood of an adverse decision is merely possible.*

281.    The Company went on to elaborate that its handling of the dispute was the subject of the federal police's Operation Zelotes investigation, but again denied any impropriety:

> *Decisions handed down to date in the proceedings relating to profits generated abroad and the deductibility of goodwill, as above mentioned, are being investigated in the context of the operation called Zelotes ("Operation"), which is the Brazilian Federal Police investigation to whether a number of corporate taxpayers attempted to influence the decisions of CARF through illegal means.*
>
> The Internal Investigation is ongoing, and the Company is cooperating with the Federal Police an as of the date of the approval of these interim financial statements, the Company believes it is not possible to predict either the duration or the outcome of the Operation by the Federal Police or of the Internal Investigation.
>
> *The Company's legal advisors confirm that the procedures adopted by the Company with respect to the tax treatment of profits abroad and the deductibility of goodwill were strictly legal, and, therefore, the likelihood of loss with respect to said proceedings is possible (but not likely).*

282.    The Company again acknowledged it had engaged outside counsel to conduct an internal investigation to determine "if there is any evidence of fraud."

283.    The 1Q16 Form 6-K was signed by Scardoelli.

284.    The Company issued a press release the same day, May 4, 2016, repeating the quarterly financial results.  A copy of the press release was filed with the SEC on Form 6-K on May 5, 2016, signed by Scardoelli.

**Reasons Why Statements in ¶¶240-284 Were Knowingly False and Misleading**

285.    The press releases, public statements and financial reports described above, and the representations about Gerdau's risk factors, business developments, governmental policies, income tax related obligations and expenses, financial statements, disclosure and internal controls and denials of wrongdoing contained therein, were each materially false and misleading when made

- 73 -

because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

       (a)      contrary to statements that the Company operated under "strict ethical principles," Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to illegally evade income taxes by bribing officials of CARF and engaging in other crimes to secure tax rulings in Gerdau's favor;

       (b)      contrary to statements that the Company was committed to maintaining "a relationship of transparency" with investors, Gerdau and its executive officers, including André Gerdau and Luz, were engaged in an on-going, multi-year conspiracy to conceal the true nature of the corporate restructuring transactions from 2005, in which Gerdau borrowed money from Itaú BBA, secured by equity in the Company's subsidiaries and a put option requiring the parent company controlled by the Gerdau family, Indac, to repurchase the equity.  Those corporate restructuring transactions were used to create the bogus goodwill deductions at issue in the tax bribery scheme;

       (c)      Gerdau was then the subject of an ongoing dispute with Brazil's tax authorities over its improper accounting for goodwill related to the 2005 corporate restructuring, which the DRJ had already determined to be improper; but for Gerdau's bribes, an adverse ruling from CARF on this dispute was more than "merely possible," but indeed was likely, and the reserves for contingent tax liabilities were woefully inadequate to cover the unpaid taxes, penalties and fines of nearly R\$4 billion;

       (d)      the unlawful practices perpetrated by Gerdau and its executive officers subjected the Company to numerous risks, which had already materialized, including monetary risk, reputational risk, risks associated with retention and/or renewal existing contracts, risks associated

- 74 -

with the Company's international expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities and even a compulsory dissolution of Gerdau as a legal entity;

(e)     the April 6, 2015 letter from CVM placed defendants on notice of the Company's possible implication in Operation Zelotes;

(f)     the unlawful practices perpetrated by defendants were in direct violation of the Company's Code of Ethics, which defendants represented guided their operations and by which executives of the Company were bound;

(g)     Gerdau's disclosure controls and procedures were either inadequately designed and insufficient to ensure that improper payments to tax authorities to waive or reduce Gerdau's tax liabilities was made known to defendants, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that André Gerdau, Scardoelli and Gasparetto were unaware of such improper payments, but they failed to disclose these material facts;

(h)     Gerdau's financial statements had not been prepared in conformity with IFRS (*see* ¶¶298-327) and, *inter alia*, materially understated the Company's tax liabilities and materially overstated the Company's net income;

(i)     the unlawful practices perpetrated by Gerdau and its executive officers were reasonably likely to have a material adverse effect on the Company's future operating results; and

(j)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about Gerdau's then-current business and future financial prospects.

## VII.   GERDAU'S CEO INDICTED – ADR PRICE TUMBLES

286.   On May 16, 2016, the last day of the Class Period, news broke that federal police in charge of Operation Zelotes had indicted André Gerdau.  As reported by *The Wall Street Journal* in an article entitled, "Brazil's Police Accuse Gerdau CEO of Corruption":

> SAO PAULO – Brazil's federal police have accused the head of the country's biggest steelmaker, Gerdau SA, of corruption-related offenses and say his firm participated in a scheme to evade 1.5 billion reais ($428.6 million) in taxes.
>
> Police made the accusations against Chief Executive André Gerdau Johannpeter and 18 other suspects in a report filed Friday in a federal court, a police spokesman said Monday.  The full report hasn't been released.
>
> In addition to Mr. Johannpeter, police are seeking charges against other company executives, tax authority officials and lawyers on allegations of bribery, money laundering and influence peddling, according to a police statement.  Only prosecutors can file charges in Brazil's legal system.
>
> In an emailed statement, Gerdau said Monday that it has yet to see the police report containing the accusations.  But it "received with immense surprise and repudiation the news that company executives, among them its CEO, are among the accused."
>
> "None of them ever promised, offered or gave improper benefits to public functionaries so that cases open in CARF would be illegally judged in their favor," the company said of its executives.  The company added that it is at the full disposal of authorities to provide the requisite "clarifications" in the case.
>
> The latest move by police came as part of an investigation known as Operation Zealots, which since March 2015 has pursued allegations that company executives bribed tax officials to win favorable judgments from a special tax court known as CARF.
>
> Federal Police raided Gerdau offices in February as part of the probe.  At the time, Mr. Johannpeter was questioned by police for about two hours.
>
> Amaldo Malheiros Filho, a lawyer for both the company and Mr. Johannpeter, 53, said at the time that neither party did anything illegal.
>
> *          *          *
>
> Operation Zealots centers on allegations that certain companies avoided paying large fines by bribing members of CARF, an appeal council that adjudicates disputes between Brazil's tax agency and the nation's top taxpayers.

- 76 -

Investigators are scrutinizing CARF decisions since 2005 that led to reduced fines, prosecutors say.

Gerdau's shares in Sao Paulo plunged 6.7% to 6.16 reais Monday as reports of the Federal Police action leaked out.

287.    As a result of this news, the price of Gerdau ADRs fell $0.13, or over 7%, to close at

$1.72 per ADR on May 16, 2016.

288.    On May 17, 2016, *TheStreet* also published the news, in an article entitled, "Gerdau

(GGB) Stock Falls, CEO Accused of Corruption":

Shares of Gerdau SA (GGB) stock are down 1.16% to $1.70 late Tuesday afternoon after Brazil's police accused the country's largest steelmaker and its CEO of corruption-related offenses, the Wall Street Journal reported.

Filed Friday in federal court, police are seeking charges against Chief Executive André Gerdau Johannpeter and 18 other company executives, tax authority officials and lawyers for evading 1.5 billion reais or $428.6 million in taxes owed by the firm.   They are being sought on charges of bribery, money laundering and influence peddling, a police spokesman told the Journal yesterday.

Last night, Gerdau wrote in an email to the Wall Street Journal that the firm has not yet seen the report containing the accusations but assured its executives never "promised, offered or gave improper benefits to public functionaries so that cases open in CARF would be illegally judged in their favor."

The charges against Gerdau come as part of the Brazilian police's Operation Zealots investigation.   The probe was launched in March 2015 and has led police to pursue allegations that Gerdau executives bribed tax officials to win favorable judgments from a special tax court known as CARF, the Journal said.

In February, the firm's offices were raided and Johannpeter was questioned by police for two hours, according to the Wall Street Journal.

Gerdau's shares have dropped as much as 6.7% after the corruption allegations leaked.   The average volume for the Rio De Janeiro-based company has been 11.58 million shares per day while this afternoon Gerdau had 17.30 million shares on heavy trading. Gerdau has a market cap of $3.4 billion and is part of the basic materials sector, and metals and mining industry.

289.    Responding to the charges, Gerdau posted the following "Material Fact" on its

website on May 18, 2016 ("Material Fact"):

- 77 -

Gerdau S.A. ("Gerdau" or "Company"), announces that, after being surprised by the news on the website of the Federal Police and in the media on the conclusion of the 6 Phase of Operation Zelotes, only today has it gained access to the Report that recommends the indictment of its chief executive officer, one executive and two former executives, who have already provided clarifications in connection with the Operation.

*The Company once again reiterates that neither Gerdau nor any of the four aforementioned individual have ever promised, offered or given any undue benefit to government officials to ensure that appeals filed at the Administrative Council of Tax Appeals (CARF) were illegally tried in favor of the Company*, especially because said cases are still pending.

Therefore, the clarifications given previously by the Company, including its Comprehensive Annual Financial Statements for the fiscal year ended December 31, 2015, remain valid, given that it has always made use of third-party firms to ensure high-quality advisory services of a strictly technical nature for its cases filed at CARF, with the contracts with these third-party firms, consistent with those signed with the Company's other third-party service providers, containing clauses that determine absolute respect for the law, with any violations resulting in the immediate termination of the contract.

*No amount was paid or transferred to the third-party firms in the specific case and the contracts were rescinded once the names of the service providers under investigation were reported in the media for suspected illegal activities*.

*Gerdau, as a company that has been in operation for 115 years, reiterates that it adopts rigorous ethical standards in all of its dealings with government agencies* and reaffirms that it is, as it has always been, available to provide any clarifications that may be requested by the authorities, and that it will firmly defend at all instances the legitimacy and integrity of its actions.

290.    The Material Fact was signed by Scardoelli.

291.    Also on May 18, 2016, a copy of the Material Fact was filed with the SEC on Form 6-K, signed by Scardoelli.

292.    As news of Gerdau's tax fraud permeated the market, Gerdau ADRs continued to be hammered by massive sales over the next three trading days.  Between May 15, 2016 and May 19, 2016, the price of Gerdau ADRs declined by $0.28 per ADR.

1197925_1

## VIII.   POST CLASS-PERIOD EVENTS AND REVELATIONS

293.   On June 13, 2016, it was reported in the Brazilian media that as a result of the Operation Zelotes investigation, all four CARF decisions on Gerdau's goodwill deductions had been vacated. The article indicated that three of those decisions were favorable to Gerdau, and had been issued in April 2012 by panels led by da Silva. The article noted that an investigator from the Ministry of the Economy, Marco Aurelio Zortea Marques, confirmed that the decisions favorable to Gerdau from April 2012 are practically the only victories obtained by a taxpayer at CARF.

294.   On July 13, 2016, Gerdau alerted investors that on re-evaluation of the earlier decisions, the Superior Chamber of CARF had ruled against it in the goodwill tax dispute. In a "Notice to the Market" posted to its website that day, the Company stated:

> Gerdau ("Company") hereby announces to its shareholders and the general market that *the following administrative proceedings were ruled against the Company in the Superior Chamber of Tax Appeal, the final administrative instance of the Administrative Council of Tax Appeals (CARF)*, after the casting vote by the President of the Judging Panel and representative of the Treasury: 10680.724392/2010-28, 11080.723701/2010-74, 11080.723702/2010-19 and 16682.720271/2011-54, filed by the subsidiaries Gerdau Açominas S.A., Gerdau Aços Especiais S.A., Gerdau Comercial de Aços S.A. and Gerdau Aços Longos S.A., respectively. These proceedings questioned the disallowance of the deductibility of amortized goodwill from the calculation base of Corporate Income Tax (IRPJ) and Social Contribution on Net Income (CSLL), as a result of a corporate restructuring carried out in 2004/05 and the application of articles 7 and 8 of Federal Law 9.532/97.

> Note that the decision has not yet been published through the respective appellate decision. After its publication, the Company will analyze the possibility of filing an appeal also in the administrative instance. Should the appeal be filled and denied, the discussion will be submitted to the Judicial Branch, with low financial impact, corresponding to the payment of escrow deposit.

> *The Company maintains its position of not constituting provision for contingencies, as in its understanding and that of its legal counsel, the likelihood of winning the case is possible. The restated amount of the four tax deficiency notices as of June 30, 2016 is R$3,767 million, of which R$1,252 million is the principal, R$939 million is the fine and R$1,576 million is interest. Gerdau*

- 79 -

*considers it appropriate to disclose this fact to the market, reiterating its commitment to transparency with its shareholders and investors*.

295.   The Notice to the Market was signed by Scardoelli.

296.   Also on July 13, 2016, a copy of the Notice to the Market was filed with the SEC on Form 6-K, signed by Scardoelli.

297.   During a conference call with investors and analysts on August 10, 2016 to discuss the Company's quarterly financial results, a Morgan Stanley analyst inquired about the case. Defendants continued to maintain that the adverse ruling would not materially impact the Company, and that the odds of winning the case were favorable:

> [ANALYST:] And the second question is on CARF. If there is any update about the case, and if the Company has any reasons to believe or has been notified of potential additional years that the fiscal authorities may be reviewing and that they may try to collect higher taxes from the Company.
>
> [SCARDOELLI:] In terms of CARF, as of July of 2016, the Company told the market that we appeal to the lower court, and the Ministry of Treasury said that all of the stages were now being studied. There hasn't been a final opinion yet. But after we are communicated by the court on the final results, we can still present some additional remedies. . . . *But this will have a very low financial impact to the Company*. Because we also posted some judicial guarantees. *The Company maintains its position of not having provisions for contingencies. Because the probability of gaining this case is still good*.

## IX.   GERDAU'S CLASS-PERIOD FINANCIAL REPORTS DID NOT COMPLY WITH INTERNATIONAL FINANCIAL REPORTING STANDARDS

298.   Defendants represented that each of the financial statements, and the financial disclosures related thereto, issued by Gerdau during the Class Period (collectively referred to herein as the "Class Period financial statements") were presented in conformity with IFRS. These representations were materially false and misleading when made because the Class Period financial statements contained false and misleading representations resulting from the illegal tax evasion scheme perpetrated by Gerdau and its executive officers.

- 80 -

299.    First, the income tax related disclosures included in the Class Period financial statements were materially false and misleading and presented in violation of IFRS.  Additionally, the Class Period financial statements failed to disclose the potential fines, penalties and other contingent liabilities ensuing from the unlawful practices perpetrated by Gerdau's senior management.

300.    Compliance with applicable accounting standards is a basic fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [IFRS] will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).

301.    During the Class Period, Gerdau filed its annual financial statements with the SEC on Form 20-F for the years ended December 31, 2011, 2012, 2013, 2014 and 2015, which represented, in pertinent part, and in all material respects:

> the Company's audited consolidated financial statements . . . included in this Annual Report that have been prepared in accordance with International Financial Reporting Standards (IFRS), issued by International Accounting Standard Board (IASB) as well as with the information presented under "Presentation of Financial and Other Information" and "Selected Financial and Other Information of Gerdau".

302.    Similarly, during the Class Period, Gerdau filed its quarterly financial statements with the SEC on Form 6-K for the periods ended: March 31, 2013, 2014, 2015 and 2016; June 30, 2012, 2013, 2014 and 2015; and September 30, 2012, 2013, 2014 and 2015, which represented, in pertinent part, and in all material respects:

> The Company's Condensed Consolidated Interim Financial Statements . . . have been prepared in accordance with International Accounting Standard (IAS) No 34, which establishes the content of condensed interim financial statements.  These Condensed Consolidated Interim Financial Statements should be read in conjunction with the Consolidated Financial Statements of Gerdau S.A., [for the most recent year end], which were prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board – IASB.

- 81 -

303.     The representations in ¶¶301-302 above were materially false and misleading when made because, in violation of IFRS, defendants knowingly or recklessly caused Gerdau to issue the Class Period financial statements that: (i) included materially misleading representations about Gerdau's income tax policies and procedures; (ii) materially misrepresented the Company's income tax liabilities and expense, which resulted in concomitant misrepresentations about Gerdau's reported net income; and (iii) misrepresented Gerdau's contingent liabilities associated with the unlawful bribery and tax avoidance scheme perpetrated by Gerdau's senior management.

A.     **Misleading Representations About Gerdau's Income Tax Policies and Procedures**

304.     IFRS, specifically International Accounting Standard ("IAS") 12, *Income Taxes*, requires income taxes expected to be paid to tax authorities for the current and prior periods be recognized and reported as liabilities on an entity's financial statements.  IAS 12 also provides that the calculus of income tax expense reported in an entity's financial statements include income taxes payable to tax authorities.

305.     In Gerdau's annual financial statements included in the Company's Forms 20-F filed with the SEC during the Class Period, defendants misleadingly represented that Gerdau's income tax policies and procedures were accounted for in a manner consistent with the requirements of IFRS, stating, in pertinent part, and in all material respects:

**Current and Deferred Income and Social Contribution Taxes**

Current income and social contribution tax expense is calculated in conformity with current tax laws in effect at the date of the financial statements in the countries where the Company's subsidiaries, associates and jointly-controlled entities operate and generate taxable income.  Management periodically evaluates positions taken in relation to tax matters which are subject to interpretation and recognizes a provision when there is an expectation of payment of income tax and social contribution in accordance with the tax bases.  The expense for income tax and social contribution taxes comprises current and deferred taxes.  Current tax and deferred tax is recognized in income unless they are recognized for a business

- 82 -

combination, or for items directly recognized in equity through other comprehensive income.

Current tax is the tax payable or receivable on the expected taxable income or loss for the year, at the tax rates effective at the balance sheet date.

*       *       *

The Company only recognizes a provision on tax issues if a past event leads to a present obligation.  The Company determines whether a present obligation exists at the reporting date by taking in consideration all available evidence, including, for example, the opinion of legal advisors.  The Company also considers whether it is probable that there will be an outflow of assets and a reliable estimate can be made of the amount of the obligation.

306.    These representations were materially false and misleading when made because, as defendants knew, such representations failed to disclose material facts associated with the then on-going, multi-year conspiracy perpetrated by the Company and its executive officers, including defendant André Gerdau, to evade income taxes totaling R$1.20 billion.

307.    As detailed herein, the Company and its senior managers manipulated and influenced the decisions of CARF by bribing its officials and engaging in other crimes to secure tax rulings in Gerdau's favor.

308.    Accordingly, once Gerdau chose to speak about its income tax policies and procedures, it had a duty to speak completely and truthfully, including speaking about the effects of defendants' illegal tax avoidance scheme on Gerdau's income tax policies and procedures, as well as its reported income tax liabilities and expense.

### B.    Material Misrepresentations About Gerdau's Income Tax Liabilities, Expense and Net Income

309.    As detailed in herein, Gerdau issued press releases and the Class Period financial statements that included representations about the Company's income tax liabilities, which Gerdau referred to as its "tax provisions" and "tax contingencies," as well as its income tax expense and net

- 83 -

income.[5]  These representations, included disclosures about the Company's then on-going tax proceedings at the CARF and Gerdau's conclusions about the likely outcomes of such proceedings. *See, e.g.*, ¶¶58, 109, 155, 199, 209, 221, 229, 255.

310.    Defendants knew that Gerdau's conclusions about the likely outcomes of the tax proceedings at the CARF reported in the Class Period financial statements filed with the SEC were materially misleading when made because they omitted material facts upon which the conclusions were based – that Gerdau and its executive officers had been bribing CARF officials and engaging in other criminal conduct to obtain favorable tax rulings.

311.    In addition, defendants knew the Class Period financial statements were materially false and misleading when issued because Gerdau's income tax liabilities and income tax expense were understated and its net income was overstated by, at least, R$1.20 billion.  These misstatements were material to the Company's reported operating results and financial position during the Class Period.

312.    As noted in the SEC's Staff Accounting Bulletin No. 99 ("SAB No. 99"), materiality in the context of financial information not only includes an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial information (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

313.    Thus, SAB No. 99 notes, in pertinent part, that:

---

[5]    IFRS, in IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*, defines "provision" as a liability of uncertain timing or amount and "contingent liability" as a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity.

- 84 -

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions" in favor of an approach that takes into account all the relevant considerations.  In so doing, it made clear that –

[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.

(Footnotes omitted.)

314.    Accordingly, SAB No. 99 provides "the staff believes that there are numerous circumstances in which [financial] misstatements below 5% [of earnings] could well be material. **Qualitative factors** may cause [financial] misstatements of quantitatively small amounts to be material."

315.    In this regard, SAB No. 99 notes "***[w]hether the misstatement involves concealment of an unlawful transaction***" is a qualitative factor that may well render material a quantitatively small misstatement of a financial statement item.  As noted herein, the Brazilian Federal Police indicted defendant André Gerdau and 18 other company executives, tax authority officials and lawyers, accusing them of bribery, money laundering, influence peddling and conspiring to evade R$1.20 billion.

316.    SAB No. 99 also notes "misstatement[s] affect[ing] the registrant's compliance with loan covenants or other contractual requirements" may also render material a quantitatively small misstatement of a financial statement item.

317.    Given its level of indebtedness, Gerdau's 2015 Form 20-F discloses that increases in the Company's liabilities subject it to numerous risks, including a credit rating downgrade and limitations on its ability to obtain additional financing and/or declare dividends.  Moreover, since much of the Company's debt is subject to cross-default provisions, a material increase in the

- 85 -

Company's debt level increases the risk of default in its credits, which may trigger events of default in its other debt agreements.

318.    Accordingly, the failure to recognize and report R$1.20 billion in income tax liabilities and income expense during the Class Period rendered the Class Period financial statements materially false and misleading.

319.    Indeed, on May 26, 2016, just days after it was made public that Gerdau was likely liable for R$1.50 billion in back taxes, as well as additional charges for penalties and interest, *Morningstar Equity Research* reported that it was dropping its coverage of Gerdau due to its very high level of financial leverage, stating, in pertinent part:

> **Dropping Coverage of Gerdau**
>
> Gerdau has zero equity value in our base case and, largely due to its very high financial leverage, an extreme uncertainty rating.  Therefore, we are dropping analyst coverage.  We provide broad coverage of more than 1,500 companies across more than 90 industry groups and adjust our coverage as necessary based on client demand and investor interest.

## C.    Misleading Representations About Gerdau's Contingencies

320.    As noted above, IFRS defines a contingent liability as a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity.  IRFS requires financial statements to disclose contingent liabilities when the possibility of their settlement is greater than remote.  *See, e.g.*, IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*. This disclosure is to include a description of the nature of the obligations and "adequate information" and the "major assumptions" concerning the uncertain future events.

321.    In addition, the SEC considers the disclosure of loss contingencies to be of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17

C.F.R. §210.10-01], which provides that disclosures in interim-period financial statements may be abbreviated and need not duplicate the disclosure contained in the most-recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

322.     Defendants, in violation of IFRS, caused the Company to issue the Class Period financial statements that failed to disclose contingencies associated with the unlawful bribery and tax avoidance scheme perpetrated by Gerdau's senior management.

323.     During the Class Period, the Company and its executive officers, including defendant André Gerdau, engaged in a multi-year conspiracy to illegally evade income taxes by bribing its officials of the CARF and engaging in other crimes to secure tax rulings in Gerdau's favor.  These unlawful acts subjected Gerdau to massive contingent liabilities, including fines, criminal penalties and/or other sanctions which, in violation of IFRS, were not disclosed in the Class Period financial statements.

324.     After the press reported that Gerdau was implicated in Operation Zelotes and the Brazilian Federal Police executed court-ordered searches and seizures of the Company's premises, Gerdau's 2015 Form 20-F belatedly disclosed the contingent liabilities ensuing from the illegal tax evasion scheme perpetrated by defendant Gerdau and its executive officers, stating, in pertinent part, as follows:

> ***Our operations expose us to risks and challenges associated with conducting business in compliance with applicable anti-bribery anti-corruption and antitrust laws and regulations***.
>
> We have operations in Brazil and other countries in South America, North America, Europe, and Asia.  We face several risks and ***challenges*** inherent in conducting business internationally, where we are subject to a wide range of laws and regulations such as the **Brazilian Anti-Corruption Law** (Law 12.846/2013), Antitrust Law (Law 12.529/2011), **the U.S. Foreign Corrupt Practices Act**, or FCPA, and similar anti-bribery, anti-corruption and antitrust laws in other

jurisdictions. In recent years there has been an increased focus on corruption in Brazil and also the investigation and enforcement activities of the United States under the FCPA and by other governments under similar laws and regulations. These laws generally prohibit corrupt payments to governmental officials and certain payments, gifts or remunerations to or from clients and suppliers.

*Violations of these laws and regulations could result in fines, criminal penalties and/or other sanctions against us, our officers or our employees, requirements to impose more stringent compliance programs, and prohibitions on the conduct of our business and our ability to participate in public biddings for contracts. We may incur expenses and recognize provisions and other charges in respect of such matters. In addition, the increased attention focused upon liability issues as a result of investigations, lawsuits and regulatory proceedings could harm our brand or otherwise impact the growth of our business. The retention and renewal of many of our contracts depends on creating a sense of trust with our customers and any violation of these laws and regulations may irreparably erode that trust and may lead to termination of such relationships and have a material adverse effect on our financial condition and results of operations. If any of these risks materialize, our reputation, strategy, international expansion efforts and our ability to attract and retain employees could be negatively impacted, and, consequently our business, financial condition, results of operations and prospects could be materially adversely affected.*

In March 2015, it was reported in the press that the Brazilian Federal Police had started an operation called Zelotes ("Operation"), to investigate whether a number of corporate taxpayers attempted to influence the decisions of the Administrative Board of Tax Appeals (CARF) through illegal means. On April 6, 2015, the Company received an inquiry from the CVM requesting clarifications regarding news reports linking the Company to the Operation. The Company clarified that, up to that moment, it had not been contacted by any public authority concerning the Operation.

Considering the involvement of Gerdau's name in press reports concerning the Operation, the Board of Directors decided to engage outside counsel, which would report to a Special Committee of the Board, to conduct an investigation.

On February 25, 2016, the Federal Police came to Gerdau's premises to execute court ordered searches and seizures, taking documents and data for examination. The Federal Police also interviewed certain individuals associated with Gerdau, including its Chief Executive Officer and another current Board member. On that same date, filing a press release with SEC and CVM, the Company informed Bovespa and the New York Stock Exchange (NYSE).The internal investigation is ongoing, and the Company is cooperating with the Federal Police. See Notes 17 and 31 to the Consolidated Financial Statements (Tax, Civil and Labor Claims and Contingent Assets and Subsequent Events) for further information.

> Although the Company does not presently believe that these matters will have
> a material adverse effect on its business, given the inherent uncertainties in such
> situations, the Company can provide no assurance that these matters will not be
> material to its business in the future.

(Emphasis in bold and italics in the original).

325.    In violation of IFRS, the contingent liabilities noted above were misleadingly omitted from the Class Period financial statements.

326.    As a result, the Class Period financial statements issued by defendants were presented in violation of IFRS and included materially misleading representations about Gerdau's income tax policies and procedures; materially misrepresented the Company's income tax liabilities and expense, which resulted in concomitant material misrepresentations about Gerdau's reported net income; and misrepresented the contingent liabilities associated with the unlawful bribery and tax avoidance scheme perpetrated by Gerdau's senior management.

327.    In addition, the misstatements in the Class Period financial statements materially distorted the Company's financial ratios, including its debt-to-equity and financial-leverage ratios. These financial ratios were material to Gerdau's credit ratings and its ability to raise capital during the Class Period.

## X.      ADDITIONAL SCIENTER ALLEGATIONS

### A.      Defendants Were Aware of All Details of the Corporate Restructuring Transactions Implemented in 2005 to Support the Goodwill Deductions

328.    Defendants were aware, or were under an obligation to be aware of the fact that Gerdau undertook the 2005 corporate restructuring of the Company's subsidiaries set forth above. *See* ¶¶5-8. As such, defendants knew the purpose of the restructuring was to support the Company's goodwill deductions from 2005 to 2010 that were at the center of the CARF appeals beginning in 2010. Furthermore, defendants were aware that Gerdau borrowed close to R\$2 billion from Itaú

- 89 -

BBA to complete the restructuring.  Defendants further were aware that to service the loan, Itaú BBA required equity in the subject subsidiaries to secure the loan and that Indac granted Itaú BBA a put option requiring Indac to repurchase the shares given as collateral in 2015 at a fixed price.  *See, e.g.*, ¶¶4, 27, 33, 35.

329.    Defendants were desperate to keep the price of Gerdau stock artificially inflated because they knew that Itaú BBA would exercise the put option.  Defendants were likewise desperate to reverse Federal Revenue's tax assessments because the potential tax, penalties and interest could approach R$4 billion.  Therefore, defendants embarked on the corruption of the CARF tax appeal process.  *See* ¶¶15-22.

330.    Initially, defendants were aware that their efforts to corrupt the CARF tax appeal process were successful because three of the tax assessments levied by Federal Revenue were reversed by da Silva – the CARF councillor presiding over the Gerdau appeals in April 2012.  Defendants knew these reversals in favor of the taxpayer, Gerdau, were highly unusual and were accomplished as a result of "contracts" to pay bribes to da Silva.  Furthermore, defendants were aware that the efforts to corrupt the CARF tax appeal process continued after Federal Revenue appealed the CARF decisions in Gerdau's favor from April 2012.  The evidence captured by federal police during the Operation Zelotes investigation includes telephone conversations which reveal that the officials being bribed recognized the bribery efforts were more important during the second phase of the CARF appeals process.  *See* ¶¶15-22.

331.    Defendants were likewise desperate to keep the details of the repurchase transaction from investors.  *See* ¶¶33-35.  When Gerdau first announced that it would purchase shares of subsidiaries of which it already owned 95%, the Company did not disclose any meaningful information about the transaction.  *See* ¶¶33-35.  When minority shareholders complained,

- 90 -

defendants were ultimately forced to reveal that Gerdau was paying Itaú BBA three to four times what it was paying Acelor for the same shares.  Defendants were also forced to reveal that Gerdau was paying R$1.98 billion for shares in its own subsidiaries.  *See* ¶¶33-35.

### B.      The Individual Defendants Were Specifically Tasked with Monitoring Gerdau's Compliance and Reputational Risks

332.     Beginning in May 2012 and throughout the Class Period, Gerdau maintained a Risk Management Policy to "identify[] and analyz[e] any risks that could affect the company, as well as establish[] controls and procedures for monitoring risks to prevent or minimize their impacts."

333.     The Risk Management Policy placed responsibility for evaluating and mitigating business risks and ensuring adequate risk management processes on Gerdau's Executive Committee.

334.     Pursuant to the Risk Management policy, the Company also established a Risk Committee, composed of the CEO, CFO, Chief Operating Officer, Chief Legal and Compliance Officer, Accounting Director and Internal Audit Manager.

335.     The Risk Committee was tasked with evaluating the adequacy of Gerdau's risk controls and conducted audits of the Company's various business processes.  The Risk Committee presented an account of its activities to Gerdau's Executive Committee twice yearly, and to the Board of Directors annually.

336.     The Risk Committee was also responsible for reviewing and investigating complaints of ethical misconduct that were reported via the Company's Ethics Helpline or directly to the Risk Committee.

337.     Furthermore, the Risk Management Policy directed that compliance and reputational risks were among those risks that required "the external disclosure of information."

338.     During the Class Period, defendants André Gerdau, Claudio Gerdau and Luz served on the Risk Committee.  As a result of their membership in the Risk Committee, defendants had

access to, and were responsible for reviewing, information concerning the Company's legal compliance, possible ethical breaches, and risks to the Company's reputation, and further had the duty to convey this information to the Executive Committee and the Board of Directors.  Defendants therefore knew, or were reckless in not knowing, that the Company had engaged in improper payments to the tax authorities, as detailed herein.

### C.    The Individual Defendants Were Members of Gerdau's Disclosure Committee

339.    At all relevant times, Gerdau maintained a Disclosure Committee whose function was described as follows:

> The company has established disclosure controls and procedures to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms. ***And such information is accumulated and made known to the officers who certify the Company's financial reports and to other members of senior management and the Disclosure Committee as appropriate to allow timely decisions regarding required disclosure.***

> \*        \*        \*

> The Disclosure Committee . . . ***oversees and reviews all materials for which there is a legal disclosure requirement, together with all data required to support the documents mentioned above.  This committee meets at regular intervals in order to review all data.***

340.    The Disclosure Committee was comprised of the CEO, the CFO and Investor Relations Executive Officer, the Executive Vice President, Legal and Compliance, the Accounting Director, the Financial Director, and the Corporate Communication & Public Affairs Director.

341.    During the Class Period, the members of the Disclosure Committee were: André Gerdau (2012-2016); Dias (2012-2014); Luz (2012-2016); Scardoelli (2012-2016); Gasparetto (2012-2016); André Areno (2015-2016); and Clemir Uhlein (2015-2016).

- 92 -

342.     The Disclosure Committee reviewed and approved each of the quarterly and annual financial reports described herein.  As members of the Disclosure Committee, defendants had access to, and a duty to review, all information supporting those reports and public statements.  Defendants therefore knew the adverse facts described herein, *see, e.g.*, ¶69, and knew that the Company's financial reports and public statements failed to disclose those adverse facts, but defendants approved and did not correct those statements.

### D.     Defendants Violated Gerdau's Code of Ethics

343.     Prior to the Class Period, the Company adopted a Code of Ethics.  The Code of Ethics was developed with input from Gerdau's Board of Directors, Executive Committee and "main leaders."  According to the Company, the Code of Ethics "focused on the ethics and compliance issues most important to a publicly-held company."

344.     The Code of Ethics "strictly prohibit[ed]" improper payments to government authorities, and reflected defendants' knowledge that "an illegal or improper payment can devastate the Company's image," in addition to exposing the Company to the risk of civil liability or criminal prosecution.

345.     The Code of Ethics also established a process by which employees could report suspected breaches or misconduct, including the implementation of an Ethics Helpline. The Company's Risk Committee, of which the Individual Defendants were members, reviewed and investigated reports of wrongdoing as received by the Ethics Helpline.

346.     The provisions of the Code of Ethics applied to all Gerdau employees, including the CEO, CFO, Chief Accounting Officer, Compliance Officer and "other persons performing similar functions."

347.    In violation of their obligations under the Code of Ethics, defendants knew but failed to disclose that the Company was engaging in prohibited conduct, specifically, improper payments to CARF as detailed herein.

## XI.    LOSS CAUSATION

348.    As detailed herein, defendants engaged in a scheme to deceive Lead Plaintiff and the market through a course of conduct that artificially inflated the price of Gerdau ADRs and operated as a fraud or deceit on Lead Plaintiff and other members of the Class by misrepresenting and failing to disclose the adverse facts detailed herein.  As defendants' prior misrepresentations and fraudulent conduct were disclosed, and when the materialization of the risks that had been concealed by defendants occurred and became apparent to the market, the price of Gerdau ADRs declined significantly as the prior artificial inflation came out of the price of Gerdau ADRs.

349.    As a result of its purchases of Gerdau ADRs, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Gerdau ADRs to trade at artificially inflated prices, with the price of Gerdau ADRs reaching as high as $10.38 on September 14, 2012.

350.    By concealing from Lead Plaintiff the adverse facts detailed herein, defendants presented a misleading picture of Gerdau's business, products and operations.  As the truth about the Company was revealed to the market, the price of Gerdau ADRs fell significantly, removing the inflation from the price, causing real economic loss to Lead Plaintiff and other members of the Class who purchased Gerdau ADRs during the Class Period.

351.    As alleged above, the declines in the price of Gerdau ADRs after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the

- 94 -

price declines in Gerdau ADRs negates any inference that the losses suffered by Lead Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

352. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Gerdau ADRs and the subsequent significant decline in the value of Gerdau ADRs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XII. APPLICABILITY OF A PRESUMPTION OF RELIANCE

353. Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact which defendants had a duty to disclose.

354. Lead Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Gerdau ADRs was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Gerdau ADRs were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Gerdau regularly communicated with public investors via established communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c) Gerdau was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

355.    As a result of the foregoing, the market for Gerdau ADRs digested current information regarding Gerdau from all publicly available sources and reflected such information in the prices of Gerdau ADRs.

## XIII.  NO SAFE HARBOR

356.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Gerdau who knew that those statements were false when made.

## XIV.  CLASS ACTION ALLEGATIONS

357.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Gerdau ADRs during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their

legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

358.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Gerdau ADRs were actively traded on the NYSE. Record owners and other members of the Class may be identified from records maintained by Gerdau or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Lead Plaintiff, more than 300 million Gerdau ADRs were outstanding during the Class Period. Accordingly, Lead Plaintiff reasonably believes that there are thousands of members in the proposed Class.

359.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

360.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

361.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)     Whether defendants' acts as alleged herein violated the federal securities laws;

    (b)     Whether defendants' statements made to the investing public misrepresented or omitted material facts about Gerdau's business, operations and financial condition;

    (c)     Whether the price of Gerdau ADRs was artificially inflated during the Class Period; and

(d)     To what extent the Class members have sustained damages and the proper measure of damages.

362.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(False and Misleading Statements)**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5(b)**
**Against Gerdau, André Gerdau, Schirmer, Dias, Scardoelli, Luz and Gasparetto**

363.    Lead Plaintiff incorporates ¶¶1-362 by reference.

364.    During the Class Period, defendants knowingly or recklessly made, participated in the preparation of and/or caused to be disseminated, false and misleading statements of material fact, and omitted material facts necessary to make the statements about Gerdau's financial results, operations and legal compliance, in light of the circumstances under which they were made, not misleading.  Lead Plaintiff specifically refers to statements identified in the section entitled "Defendants' Fraudulent Scheme and Materially False and Misleading Statements During the Class Period."

365.    In addition to the duties of full disclosure imposed on defendants as a result of their affirmative statements and reports, defendants had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete, and accurate information with respect to the Company's operations and financial results.

366.    The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them, or made those misrepresentations and omissions of material fact without a reasonable belief in their accuracy.  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Gerdau's operating condition and financial status from the investing public and supporting the artificially inflated price of its common stock.

367.    As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Gerdau ADRs was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's ADRs was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's ADRs traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in defendants' public statements during the Class Period, Lead Plaintiff and the other Class members acquired Gerdau ADRs during the Class Period at artificially high prices and were ultimately damaged thereby.

368.    At the time of said misrepresentations and omissions, Lead Plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and other Class members and the marketplace known the truth regarding Gerdau, which defendants did not disclose, Lead Plaintiff and other Class members would not have transacted in Gerdau ADRs, or, if they had transacted in Gerdau ADRs during the Class Period, would not have done so at the artificially inflated prices which they paid.

369.     As a direct and proximate result of these defendants' false and misleading statements, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Gerdau ADRs.

370.     By reason of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5(b).

## COUNT II

### (Scheme Liability)
### For Violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### Against All Defendants

371.     Lead Plaintiff incorporates ¶¶1-370 by reference.

372.     During the Class Period, defendants, individually and together, employed devices, schemes and artifices to defraud while in possession of material, adverse, nonpublic information, and engaged in acts, practices and a course of conduct as alleged herein.  In furtherance of this unlawful scheme, throughout the Class Period, defendants:

(a)     paid sums of money, directly or through third parties, to officials who had the ability to influence the outcome of Gerdau's ongoing tax appeals, knowing and with the intent that the sums paid would ensure the officials exercised such influence in Gerdau's favor; and

(b)     concealed, or caused others to conceal, the scope, nature and intended effect of those payments.

373.     Each and every defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

374.     Defendants' fraudulent scheme and course of conduct operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their transactions in Gerdau ADRs during the Class Period.

1197925_1

375.     As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Gerdau ADRs.

376.     By reason of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c).

**COUNT III**

**For Violation of §20(a) of the Exchange Act
Against the Individual Defendants**

377.     Plaintiff incorporates ¶¶1-376 by reference.

378.     The Individual Defendants acted as controlling persons of Gerdau within the meaning of §20(a) of the Exchange Act:

(a)     By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading;

(b)     The Individual Defendants were charged with reviewing the Company's public disclosures, and had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  The Individual Defendants also controlled the contents of Gerdau's quarterly and annual financial reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  The Individual Defendants prepared,

- 101 -

reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so; and

(c)     Because of their positions as CEO, CFO, Chief Operating Officer, Investor Relations Officer, Executive Vice President of Legal and Compliance, Corporate Communications Officer, and Chairman of the Board, the Individual Defendants directly participated in the Company's management and were directly involved in Gerdau's day-to-day operations.  The Individual Defendants had the ability to direct, and did direct, the Company's acts in furtherance of their fraudulent scheme and wrongful course of conduct.

379.     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Declaring that defendants are liable pursuant to the Exchange Act;

B.     Determining and certifying that this action is a proper class action and certifying Lead Plaintiff as a class representative and Lead Plaintiff's counsel as class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C.     Awarding compensatory damages in favor of Lead Plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D.     Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E.      Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: October 31, 2016                  ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         HENRY ROSEN
                                         SUSANNAH R. CONN


                                  _____
                                            s/ HENRY ROSEN
                                           HENRY ROSEN

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         henryr@rgrdlaw.com
                                         sconn@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         drosenfeld@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         CHRISTOPHER C. MARTINS
                                         120 East Palmetto Park Road, Suite 500
                                         Boca Raton, FL  33432
                                         Telephone:  561/750-3000
                                         561/750-3364 (fax)
                                         cmartins@rgrdlaw.com

                                         Lead Counsel for Plaintiff

- 103 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 31, 2016.

s/ HENRY ROSEN
HENRY ROSEN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:HenryR@rgrdlaw.com

1197925_1

# Mailing Information for a Case 1:16-cv-03925-LLS Boland et al v. Gerdau S.A. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam M. Apton**
  aapton@zlk.com

- **Susannah R Conn**
  sconn@rgrdlaw.com

- **Richard William Gonnello**
  rgonnello@faruqilaw.com,msullivan@faruqilaw.com,ecf@faruqilaw.com,klenahan@faruqilaw.com,dbehnke@faruqilaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Geoffrey Coyle Jarvis**
  gjarvis@ktmc.com,mswift@ktmc.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,jsnematzadeh@pomlaw.com

- **Christopher Martins**
  cmartins@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Henry Rosen**
  henryr@rgrdlaw.com,dianah@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,nwise@rgrdlaw.com,e_file_sd@rgrdlaw.com,sconn@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)